McWILLIAMS *v.* LAKE SHORE & MICHIGAN SOUTHERN RAILWAY CO.

1. Trial — Reception of Testimony — Hearsay — Refusal to Strike—Discretion of Court.

Where plaintiff, without objection, testifies to matters favorable to his case, which are objectionable as hearsay, and defendant, on cross-examination, brings out further details of the same matters, refusal by the court to strike such testimony is discretionary, it having been received without objection.

2. Carriers—Passengers—Assault by Other Passenger—Duty of Carrier.

Where a carrier has, or from known conditions should have,

knowledge that the condition or actions of a passenger threaten the safety of other passengers, or that mischief is to be reasonably apprehended, the duty to exercise the highest degree of care to insure the safety of passengers arises, and the carrier is liable for failure to do so.

3. SAME—NEGLIGENCE—EVIDENCE—QUESTION FOR JURY.

In an action against a carrier for injury to a passenger by being shot on July 4th by a drunken passenger, evidence examined, and *held,* that whether the carrier, through its servants, exercised the proper care, under all the circumstances, for protection of its passengers, was a question for the jury.

Error to Lenawee; Chester, J. Submitted January 5, 1906. (Docket No. 12.) Reargued October 3, 1906. (Docket No. 4.) Decided October 29, 1906.

Case by Annie McWilliams against the Lake Shore & Michigan Southern Railway Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed.

*C. E. Weaver* and *Dallas Boudeman*, for appellant.

*Fellows & Chandler*, for appellee.

OSTRANDER, J. Plaintiff was a passenger on one of defendant's trains on the evening of July 4, 1903, from Grand Rapids to Hudson, Mich. The case set out and attempted to be proved by her is a contract of carriage and a breach of the duty of defendant to protect her from an assault committed by a fellow passenger, who was, and by the servants of defendant was known to be, intoxicated, armed with and carelessly discharging a firearm on the train. Plaintiff's case as to the cause of her injury and the attendant circumstances was made by her own testimony. Upon direct examination, without objection being made thereto, she testified:

"After these shots were fired, the conductor came through and asked me if I was hurt, and I said I guessed not very bad. He went right on through and came back immediately and asked me again, and I told him I was

hurt worse than I thought for, and he said that the gentleman had been creating some disturbance in the smoker."

The subject does not seem to have been further pursued by counsel for plaintiff. On her cross-examination, the plaintiff gave the following testimony:

"I sat on the south side of the car when I left White Pigeon, and did not change my seat. I got asleep, quieted down immediately after I got on at White Pigeon. Don't remember the train reaching Sturgis or Burr Oak or Bronson. I did not see this man with the revolver until he fired. I should judge he was a young man, 20 or 28. I didn't see his face.

"*Q.* Where did you see him, when you first saw this man?

"*A.* I saw him going out of the coach. He was pretty close to the door, trying to get to the door, trying to find the door, pretty close to the rear door of the coach. He was right by it, trying to find it. He fired twice. He fired by where I was. Then he walked on and fired again, between that place and the door. He only fired once opposite where I was. I didn't see him approaching, because I was asleep, and did not hear any other firing than the time he fired close to me.

"*Q.* And then, of course, when he fired you woke up at once?

"*A.* Yes, sir.

"*Q.* You turned around and saw him going toward, or got about to the door?

"*A.* Yes, sir.  *  *  *

"*Q.* When you first saw the conductor coming through the door, how far had this man gotten down toward the end of the car?

"*A.* Why, not—why, down pretty close to the door. The conductor came into the car just as the shot, or just after—just shut the door as the first report was given.

"*Q.* Well, you didn't know that he had just shut the door, because you were asleep?

"*A.* Well, he said he had; of course, I don't know.

"*Q.* Well, I want to get at what you saw.

"*A.* Well, I saw him just after—

"*Q.* Just as the second shot was fired, didn't you?

"*A.* Yes, sir; just about the time the second shot was fired.

" *Q.* That is, the time the second shot was fired ?

"*A.* Yes, sir.

" *Q.* Was that the first that you saw the conductor ?

"*A.* Coming in toward me.

" *Q.* Then he was just inside of the door ?

"*A.* Yes, sir; and just coming toward me.   *   *   *

" *Q.* Now, what do you say the conductor said to you first when he came along, and asked you whether you were hurt ?

"*A.* Asked me whether I was hurt.

" *Q.* And you told him you thought you weren't ?

"*A.* I wasn't; yes, sir.

" *Q.* Then he passed on through the car in the same direction the man had gone ?

"*A.* Yes, sir.

" *Q.* And how long before he came back ?

"*A.* Immediately.

" *Q.* Well, he went out of the car, did he, first ?

"*A.* He went just out of the car.   *   *   *

" *Q.* What did he say to you then ?

"*A.* Asked me if I was hurt bad, and I told him worse than I thought for.   *   *   *   He gave me his handkerchief, and I used it, and that was all.   He went back then.

" *Q.* Didn't he talk to you any more than that ?

"*A.* Not any more than to say that the man was shooting his revolver in the smoking car, and he told him if he didn't stop it he would have to put him off.   *   *   *   He said he was drunk.

" *Q.* How long before that did he say he had been shooting in the smoking car, and he told him he had got to quit or he would put him off ?

"*A.* Why, from what—I should judge it was just before he came through the car that the man got up—

" *Q.* Well, did he say so ?   Did he say when it was that he had told him to quit ?

"*A.* Yes, sir; he said it was a few minutes ago.   That was the remark he made.

" *Q.* Did he tell you that he quit shooting then, when he told him that ?

" *A.* No, he didn't say that he did or that he didn't. *   *   *

" *Q.* What kind of a revolver did he have ?

" *A.* Blank cartridge; one of these that the boys and young men use the 4th of July.   I don't know how near he was to me when he shot, because I was asleep and was

awakened by the shot. As I got to examining my face I found there was powder in it, blackened my face and went under the skin. I had the powder removed the next day by Dr. Dodge. I think he removed it all. I haven't any marks now. I saw the pistol in this man's hand. I saw it as I looked back."

Upon concluding the cross-examination, counsel for defendant moved the court to strike out the testimony of the witness as to what was said to her by the conductor the second time he came into the car, on the ground that it was hearsay, irrelevant, and incompetent. The motion was overruled and exception taken. This ruling, and exception, presents the question first to be discussed. It will be perceived that the facts that the passenger who did the shooting was, to the knowledge of the conductor, intoxicated, had been shooting in the smoking car, and had been told to stop shooting on pain of being put off the train, were called out by defendant's counsel. It was hearsay, and, if it had been offered by plaintiff and seasonably objected to, the question whether or not the hearsay rule would have required that it should be, under the circumstances of this case, excluded, would have been before us for determination. It had a tendency to prove certain conditions, and knowledge of them on the part of the conductor, favorable to the theory and the interest of the plaintiff. It is true it was by way of a claimed admission of the agent, but it was an admission of facts, the existence of which it was proper for either party to prove, and plaintiff might have proved them at the trial by the conductor or by a bystander who saw and heard what occurred. Defendant was not bound to accept the statements of plaintiff, and it did not do so. The conductor was a witness for defendant, and he denied the conversation testified to by plaintiff and all knowledge of the facts claimed to have been related by him in that conversation. Plaintiff having produced no other testimony upon the point, the jury were permitted to find: *First*, whether such a conversation took place; *second*, whether

the facts existed, and, if they believed that the conversation occurred as related by plaintiff, to find the facts of knowledge and conduct of the conductor from the alleged admissions. The trial court was not requested to limit the effect of the plaintiff's testimony. He did limit by saying to the jury that:

"She claims that the conductor admitted to her that this man was intoxicated, and that in the smoking car, in this condition, he had fired off this revolver a couple of times, and that he had told him if he did not stop he would stop the train and put him off. The plaintiff claims that from the admission of the conductor she has proven to you that he had knowledge and knew of the intoxicated condition of this person, and that he also knew that this person had fired this revolver."

No criticism of this statement of the position and claim of plaintiff is made, and no exception was taken to the charge upon any ground other than the one that the case should not have been submitted to the jury. It cannot be said that the testimony was elicited through inadvertence, or that it was volunteered by the witness. She was requested directly and repeatedly to state what the conductor said to her. Her answers were responsive to the questions put to her. No statute prohibits the introduction of the testimony. In such cases, the trial judge, in considering a motion to strike out testimony, is permitted a wide discretion, and we are of opinion that in this case there was no abuse of discretion. *King* v. *Haney*, 46 Cal. 560; *East Tennessee, etc., R. Co.* v. *Turvaville*, 97 Ala. 122; *Dugger* v. *McKesson*, 100 N. C. 1; *Farmers' & Traders' Nat. Bank* v. *Greene*, 74 Fed. 439. The testimony must be treated as though received without objection.

It is contended that, assuming the truth of the facts stated by the conductor, as related by plaintiff, there is no evidence of defendant's negligence or of failure to exercise due care for the safety of the other passengers. To state the position of counsel for defendant in his own language:

"There is no proof here that the conductor had, or could have had, any reasonable cause to believe that this party would fire his pistol after being told to desist, much less that he would go into some other car and fire it into the face of some other passenger."

The negligence for which in such cases the carrier is responsible is not the tort of the fellow passenger or the stranger, but is the negligent omission of the carrier's servants to prevent the commission of the tort. And courts have, in some cases, distinguished the liability of the carrier for torts committed by its servants and those committed by passengers or by strangers. *Tall v. Packet Co.*, 90 Md. 248 (47 L. R. A. 120). But the distinction made seems to go no further than this: that, while the liability to passengers carried for hire for tortious acts of servants is absolute, and that for the acts of strangers or fellow passengers is relative, contingent, and qualified, if the servant of the carrier has, or from known conditions should have, knowledge that the condition or actions of one admitted as a passenger threaten the safety of other passengers, or that mischief is to be reasonably apprehended, the duty to exercise the highest degree of care to insure the safety of passengers at once arises, failing in which the carrier will be held to answer for the damages sustained. See, generally, Hutchinson on Carriers (2d Ed.), § 546 et seq.; *Putnam v. Railroad Co.*, 55 N. Y. 108; *Pittsburg, etc., R. Co. v. Pillow*, 76 Pa. 510; *Ferry Cos. v. White*, 99 Tenn. 256; *St. Louis, etc., R. Co. v. Hatch* (Tenn.), 94 S. W. 671; *Mullan v. Railroad Co.*, 46 Minn. 474; *Flint v. Transportation Co.*, 34 Conn. 554, 6 Blatchf. (U. S.) 158; *Felton v. Railway Co.*, 69 Iowa, 577. The opinions in the cases herewith cited, and the many others which are referred to in the opinions, illustrate the application of the rule to various and widely differing facts. We are not called upon, in this case, no criticism being made of the charge given to the jury, to state a rule beyond this: We cannot say, as matter of law, that the con-

ductor performed his full duty in the premises in threatening to eject the offending passenger if he did not desist from shooting his revolver.. The combination of the 4th of July, a crowded train, a revolver loaded with blank cartridges, in the hands of a drunken man, with a penchant for discharging it among the passengers, is threatening and likely to cause mischief. The agent of defendant, who knew the facts, possessed all of the powers of a sheriff on the train. Whether he was not required, in the exercise of proper care, to either disarm the man or keep him under such surveillance as would be likely to prevent mischief was, under all the circumstances, a question to be submitted to the jury. .

The judgment is affirmed.

CARPENTER, C. J., and McALVAY, GRANT, BLAIR, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.