HOEK v. TOWNSHIP OF ALLENDALE.

1. MUNICIPAL CORPORATIONS—PUBLIC OFFICERS—HIGHWAY COMMISSIONER.
    A *quasi* municipal corporation is not liable for the action of officers who perform a State function imposed on them by law, whether the action is for negligence or trespass, although an action may in many cases lie against the officer personally.

2. SAME—TOWNSHIPS—TORTS OF OFFICERS.
    As a township is not liable for the tort of its highway commissioner in trespassing on the land of an adjacent proprietor in doing highway labor, no obligation can be implied to reimburse one who commits such trespass unwittingly at the command of the commissioner.

3. INDEMNITY—CONTRIBUTION—JOINT TORT-FEASORS—CONTRACTS.
    A township highway commissioner may lawfully contract to indemnify a person working under his direction from any damages which may result from the unlawful character of

his acts so directed, and, if relied on in good faith in the reasonable and honest belief of the promisor's right to so direct, the contract may be valid.

4. Contribution—Indemnity—Joint Wrongdoers.

While there is no right of contribution between joint tort-feasors, there may be a right to indemnity under a contract where the plaintiff is liable to a third party, but is not in *pari delicto* with the promisor.

5. Parties—Misjoinder.

In assumpsit against a township and its highway commissioner, brought in justice's court for indemnity against damages paid for a tort committed under the commissioner's direction, the misjoinder of the township is not fatal. Act No. 137, Pub. Acts 1903.

6. Evidence—Judgment—Parol Proof.

Proof of a judgment, against which plaintiff claims a contract of indemnity, may be made by parol, in the absence of an objection on the ground that the proof should be made by the record.

Error to Ottawa; Padgham, J. Submitted April 14, 1910. (Docket No. 87.) Decided June 6, 1910.

Assumpsit by Peter Hoek against the township of Allendale and Lloyd Molyneaux, highway commissioner, upon a contract of indemnity. A judgment for defendants on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed as to defendant township, and reversed as to defendant Molyneaux.

*Smedley, Hall & Freeland*, for appellant.

*Farr & Farr*, for appellees.

Hooker, J. Hoek worked his highway tax under direction of an overseer. He plowed up certain growing grain near the center of the road. He claims to have been sued by Schmidt, the man who sowed the grain, and to have suffered judgment in both justice and circuit courts, and to have paid the latter. He thereupon sued the highway commissioner, one Molyneaux, and the town-

ship, claiming the right to recover from one, or both, the amount paid upon the judgment, and for disbursements, and compensation for his time in preparing for and attending the suit.    In support of his action, he proved that the highway in question separated his land from that of Schmidt, but that Schmidt sowed rye to the center of the road, thus obstructing plaintiff in getting to his barn, to do which it was necessary to use this road.    We need not discuss the merits of the original controversy between plaintiff and Schmidt, or the action brought by the latter. Evidently the court found that plaintiff was a tort-feasor in plowing up the crop, and no attempt was made in this case to reopen that matter.    If the commissioner directed the work to be done at this place he may have been a wrongdoer also, and Schmidt may have had the option of bringing a joint or several action.    He chose the latter, and the sole question here is plaintiff's right to reimbursement from Molyneaux or the township, or both.    This highway was a *cul-de-sac* extending north from an east and west highway laid along the south side of the lands of plaintiff and Schmidt, and extending to Grand river. Apparently it was used but little, and Schmidt had desired to have it taken up.    This plaintiff opposed, though he admits having put a fence across it at a point north of his barn.

The testimony of plaintiff and his wife indicates unfriendliness between plaintiff and Schmidt.    It tended to prove that at some time Schmidt moved his barn upon this highway and put it in bad shape, and afterwards plowed up a portion of the road and sowed grain; that the plaintiff saw Molyneaux, then highway commissioner, and asked the privilege of working out his road tax, by putting the labor on this highway, to which Molyneaux assented, and so informed the overseer of the district. When the latter spoke to the plaintiff about his work, plaintiff told him that Molyneaux had consented to his work being done upon this highway, and offered to do it, but the overseer was unwilling to set him at work there until Moly-

neaux should locate the center line of the road. Some correspondence followed, Molyneaux writing plaintiff as follows:

> "September 28, Grand Haven Road Del. No. 1.
> "Mr. HOEK.
> "*Dear Sir:*  I was at your place today.  I did not find any one home.  I should have been  there before, but I did not get your letter on account of being directed  to the post office instead of R. F. D.  I think if you know about where the center of the road is it will be all  right to plow it up.  I think the sooner it is plowed  and graded up, the better.
> "Yours truly,
> "A. L. MOLYNEAUX, H. C."

At a subsequent interview with Molyneaux the following occurred, according to plaintiff's testimony:

"After I received this letter, Mr. Pott came to see me again.  He said, 'I see that Mr. Molyneaux has not straightened out the road yet.'  He said that he couldn't go on with it; he couldn't let me do my work because it was not straightened.  By that he meant that he wanted to know where the center of it was.  After that I went to see Mr. Molyneaux again.  He told me he would come down and straighten it out, and  he did come down about three weeks after I received this letter from him.  It was after grape picking time.  I don't remember the date.  I am sure it was three weeks after this.  When he came down we got a couple of stakes, he held the stakes and I drove them down, and straightened it out.  We commenced at the north end of the house.  One stake was opposite my house.  We did not go to the south, where the east and west road is.  We can see it plainly from our house because it is on a knoll, and we can look from the house towards the river and also the other way.  We drove one stake north of the house, and west, and the other stake opposite the house.  We found the old bed of the road, the middle of the road.  There were not any fences there to go by.  The fences were towards the river.  We could find the middle of the road.  There were not any stakes towards the south and where the east and west road run.  There was a big soft maple tree that had always been there in the center as long as I lived there.  We took that for the center.  Mr. Molyneaux helped me drive

these stakes.  He told me to plow it up now, and that no matter what Schmidt said he would stand by me.  I do not know whether he had any talk with Schmidt or not. My wife was there at the time.  She said, 'I suppose when Schmidt sees these stakes there will be more trouble.' Mr. Molyneaux said: 'Never mind Schmidt; I told Mr. Hoek to plow it up; he better plow it up and I would stand back of him.'  I did plow some of it up that fall and finished it in the year 1907—March 28th or 29th— just as soon as the frost went out.  I do not know whether Molyneaux came to see the job after it was done or not. I asked him for an order, and he gave me one for $4 for my work on that road—the order drawn on the township treasurer.   When I did this work under the instructions of Mr. Molyneaux I certainly thought that I had a right to do it.  I was sure that I was working in the center of the highway.  Mr. Molyneaux acted as though he thought that we were in the middle of the highway.  Mr. Molyneaux did not know that I was getting over into Schmidt's rye.  I did not think that I was on Schmidt's land.  I was pretty sure that I was not on his land, and I acted in good faith."

Upon the foregoing statement of facts the plaintiff claims that both Molyneaux and the township are liable. There is some testimony of conversations between the plaintiff and some of the township officers, but we think it unnecessary to refer to it further as it in no way tends to establish a liability on the part of the township.   The case is therefore reduced to a few legal questions.

1.  Liability of the Township.  Nothing is better settled in this State than the principle that a *quasi* municipal corporation is not liable for the action of officers (though elected by the township) who perform a purely State function imposed upon them by law, whether the action is for negligence or trespass, although an action may in many cases lie against the officer personally.  Such was the law of England and is of this country as the following authorities show:

In *Commissioners of Highways of Niles Township,* v. *Martin,* 4 Mich. 557 (69 Am. Dec. 333), after adverting to the English rule, this court said, in an opinion

written by the late Judge Douglass, a lawyer of great learning:

"Towns, with us, are mere political organizations, created wholly by statute for certain purposes of local government. They are vested with no franchises or special privileges for their own benefit. They have only such powers as the statute confers, and are subject to no obligations, except such as are derived from statutory provisions. It is difficult to see how any common-law obligations, the sole foundation of which is prescription and immemorial usage, can be made to attach to them. An obligation to construct and repair roads and bridges can only be derived from the possession of such powers over their construction and repair as the statute has conferred upon them. And the law will not impose an unqualified obligation, where the means of performing it do not exist. Now, the towns have power to choose commissioners of highways, but the statute, in express terms, gives to these commissioners, when elected, the care and superintendence of the highways and bridges of the town, and confers upon them all the powers requisite for the execution of their trust. They are in no way responsible to the town, but are themselves a species of *quasi* corporation, with power to sue and be sued; having legal succession, and deriving their authority, not through the town, but directly from the statute. The towns have no power to give the slightest direction or instruction to these officers, as to the performance of their duties. So the towns have power to raise money for constructing and repairing roads and bridges, but this power is limited to the raising of only $250 in any one year (Rev. Stat. 1846, chap. 22, § 4), and can only be exercised at the annual township meeting. So highway labor may be annually assessed upon persons and property within the township, but the amount to be assessed in any one year is limited (Rev. Stat. 1846, chap. 23, §§ 4, 5), and the power to assess is vested exclusively in the commissioners of highways. Further, the power to raise money for the construction of bridges is vested, in part, in the boards of supervisors of the counties (Rev. Stat. 1846, chap. 27). Looking at all the statutory provisions on the subject, we think they furnish no ground for the inference that it was intended that townships should be subject to any such broad and onerous obligation as is contended for."

Authorities are cited.   After alluding to the distinction that exists when municipal corporations proper are sued, Judge DOUGLASS adds:

"But the cases which have gone furthest in this direction distinctly assert that no such liability exists on the part of those minor political organizations, or *quasi* corporations, such as towns and counties, whose corporate powers and functions are conferred without their solicitation for the benefit, not of themselves, but of the public at large.   In *Hickok* v. *Trustees of the Village of Plattsburgh* [15 Barb. 427], the New York court of appeals, after a review of the authorities, say that it is the acceptance of a special charter that makes the incorporated body liable to this action, and it is the want of such a charter that exempts the towns, unless they are especially made liable by statute under certain circumstances as in Massachusetts."

This case was followed in *Township of Leoni* v. *Taylor*, 20 Mich. 148, where the late Mr. Justice GRAVES, referring to *Commissioners of Highways of Niles Township* v. *Martin, supra*, said:

"It is true that the action was there brought against the highway commissioners, but a proper disposition of the case made it necessary for the court to consider with some minuteness the powers, duties, and responsibilities of townships touching highways and bridges, and it was there held that under our system of township organization and management, 'the care and superintendence of the highways and bridges of the towns was given to the highway commissioners, together with all the powers requisite to the execution of their trust,' and that the 'towns had no power to give the slightest direction or instruction to such officers as to the performance of their duties,' and it was also declared that 'the law would not impose an unqualified obligation when the means of performing it did not exist.'   We think it was fully established in that case that the townships were subject to no legal duty or obligation to overlook or repair the roads and bridges within their limits, and that whatever duty the law had cast upon commissioners and overseers in that particular, the failure to perform it could furnish no cause of action against the townships."

161 MICH.—37.

See opinion of Campbell, C. J., in *People* v. *Hurlbut*, 24 Mich., at page 80 *et seq.*, and of Cooley, J., at page 102 *et seq.* (9 Am. Rep. 103). He said:

"For those classes of officers whose duties are general —such as the judges, the officers of militia, the superintendents of police, of quarantine, and of ports, by whatever name called—provision has to a greater or less extent been made by State appointment. But these are more properly State than local officers; they perform duties for the State in localities, as collectors of internal revenue do for the general government; and a local authority for their appointment does not make them local officers when the nature of their duties is essentially general. In the case before us, the officers in question involve the custody, care, management and control of the pavements, sewers, waterworks and public buildings of the city, and the duties are purely local. The State at large may have an indirect interest in an intelligent, honest, upright and prompt discharge of them, but this is on commercial and neighborhood grounds rather than political, and is not much greater or more direct than if the State line excluded the city. Conceding to the State the authority to shape the municipal organizations at its will, it would follow that a similar power of control might be exercised by the State as regards the property which the corporation has acquired, or the rights in the nature of property which have been conferred upon it. There are cases which assert such power, but they are opposed to what seem to me the best authorities, as well as the soundest reason. The municipality, as an agent of government, is one thing; the corporation, as an owner of property, is in some particulars to be regarded in a very different light."

*Sheldon* v. *Village of Kalamazoo*, 24 Mich. 383, a case relied on by plaintiff, was a case against a city, and is clearly distinguishable from the present case. A note to that case shows the distinction and cites many authorities both in Michigan and elsewhere. *Dawson* v. *Township of Aurelius*, 49 Mich. 479 (13 N. W. 824), applies the doctrine to a township drain commissioner, as also does the case of *Camp* v. *Township of Algansee*, 50 Mich. 4 (14 N. W. 672). See, also, *Barron* v. *City of Detroit*, 94 Mich. 601 (54 N. W. 273, 19 L. R. A. 452, 34

Am. St. Rep. 366), and cases cited. *Davock* v. *Moore*, 105 Mich. 128 (63 N. W. 424, 28 L. R. A. 783), applies the rule to boards of health, and *People* v. *Mahaney*, 13 Mich. 481, to the police board of Detroit; and see minority opinion in case of *City of Lansing* v. *Board of State Auditors*, 111 Mich. 332 (69 N. W. 723). *Gilboy* v. *City of Detroit*, 115 Mich. 121 (73 N. W. 128), was a board of health case. *Corning* v. *City of Saginaw*, 116 Mich. 74 (74 N. W. 307, 40 L. R. A. 526), held that the maintenance of a drawbridge was a public, and not a private, duty.

In *Jenney* v. *Township of Mussey*, 121 Mich. 229 (80 N. W. 2), a town was held not liable for the unlawful acts of its treasurer. *Murray* v. *Village of Grass Lake*, 125 Mich. 5 (83 N. W. 995), held a village not liable for a trespass ordered by its council, in flooding premises, while acting under general law, as a State agency, distinguishing *Sheldon* v. *Village of Kalamazoo, supra.* *Nicholson* v. *City of Detroit*, 129 Mich. 246 (88 N. W. 695, 56 L. R. A. 601), was a case brought by an administratrix for subjecting her husband to exposure to smallpox from which he died. The case turned upon the question now before us. The opinion cites many authorities, and the subject is discussed at length. In *Whitehead* v. *Board of Education of Detroit*, 139 Mich. 491 (102 N. W. 1029), we held in an opinion by Mr. Justice BLAIR, that the trial judge "was correct in saying that the affairs of the board of education are as purely a State function as those of a board of health," and could not be distinguished in principle from the *Case of Nicholson, supra.* See, also, *Bodewig* v. *City of Port Huron*, 141 Mich. 564 (104 N. W. 769). This was a case holding that a tortious entry and wrongful use of real estate by its health officer did not warrant a recovery against the city. *Alberts* v. *City of Muskegon*, 146 Mich. 216 (109 N. W. 262, 6 L. R. A. [N. S.] 1094, 117 Am. St. Rep. 633).

In *Davidson* v. *Hine*, 151 Mich. 302 (115 N. W. 249,

15 L. R. A. [N. S.] 575, 123 Am. St. Rep. 267), it was said in the majority opinion:

"It cannot be said that a municipality is responsible for all the negligence of its officers when they are engaged in performing a local governmental duty, and therefore it is not true that exemption from such responsibility proves that they are not performing a local governmental duty. This is settled by our own decisions. The authorities heretofore cited in this opinion prove that officers having charge of the streets of a municipality are performing local governmental duties, and that the State has no right to appoint such officers. And it is also settled that in the absence of a statute establishing a contrary rule, a municipality is not liable for the negligence of such officials."

And see minority opinion which contains a discussion of this subject. See, also, *Hall* v. *City of Concord*, 71 N. H. 367 (52 Atl. 864, 58 L. R. A. 455); *McFadden* v. *Town of Jewell*, 119 Iowa, 321 (93 N. W. 302, 60 L. R. A. 401, 97 Am. St. Rep. 321), when the rule was applied to the cutting of weeds. *Dudley* v. *City of Flemingsburg*, 115 Ky. 5 (72 S. W. 327, 60 L. R. A. 575, 103 Am. St. Rep. 253), a case growing out of coasting on the city streets, and *Dickinson* v. *City of Boston*, 188 Mass. 595 (75 N. E. 68, 1 L. R. A. [N. S.] 666, and note). See, also, 4 Current Law, p. 737; 2 Cooley on Torts (3d Ed.), p. 1303; 2 Dillon on Municipal Corporations (4th Ed.), § 976; 5 Thompson on Negligence, § 5789; *Lawson* v. *City of Seattle*, 6 Wash. 184 (33 Pac. 347); *Russell* v. *City of Tacoma*, 8 Wash. 156 (35 Pac. 605, 40 Am. St. Rep. 895); *Lynch* v. *City of North Yakima*, 37 Wash. 657 (80 Pac. 79, 12 L. R. A. [N. S.] 261). See, also, a long list of cases cited in *Cunningham* v. *City of Seattle*, 40 Wash. 59 (82 Pac. 143, 4 L. R. A. [N. S.], at pages 635, 636).

We must hold, therefore, that the township was not liable for any tort of the highway commissioner, and it necessarily follows that the law will not imply any obligation to reimburse the plaintiff for an unwitting trespass committed at the command of the commissioner. As it

is conceded that the township was not bound by his alleged promise of indemnity, we need not discuss the question of the commissioner's power to bind his town, though we cite the following cases as bearing on this subject: *Hosier* v. *Higgins Township Board*, 45 Mich. 340 (7 N. W. 897); *Mackey* v. *Township of Columbus*, 71 Mich. 227 (38 N. W. 899); *Jenney* v. *Township of Mussey*, 121 Mich. 229 (80 N. W. 2); *Sherman* v. *Carr*, 8 R. I. 431.

2. **Molyneaux's Liability.** For the purpose of this proceeding, we must assume that Molyneaux told plaintiff that he would stand back of him if there was "more trouble" with Schmidt, as Mrs. Hoek said there would be when he should see the stakes set by Molyneaux and the plaintiff. We are of the opinion that a laborer asked by his employer to work in a given place in a particular manner, in which he had reason to and did suppose his employer had a right to so direct him to work would naturally infer, from the language shown here, that he was to be protected against any damages which result to him in consequence of the unlawfulness of his compliance. It was a promise that the commissioner might lawfully make, and if relied upon in good faith, in the reasonable and honest belief of the promisor's right to so direct, the contract might be valid though otherwise it might not be. The rule of law is that while there is no right of contribution between joint tort-feasors, there may be a right to indemnity under a contract where the plaintiff is liable to a third party, but is not *in pari delicto* with his co-wrong-doer.

In a note to 22 Cyc. p. 99, it is said that these cases are exceptions to the general rule, and such exceptions obtain in two classes of cases:

(1) Where an innocent master is held to respond for the tort of his servant.

(2) Where both parties have been in fault, but not in the same fault, etc.

Many authorities are cited.

Again it is said:

" When an act has been done by plaintiff under the express directions of defendant which occasions an injury to the rights of third persons, defendant will be bound to indemnify plaintiff against the consequences of the act, provided such act is not apparently illegal in itself, and is done honestly and bona fide in compliance with defendant's directions. So a person who has been exposed to liability and compelled to pay damages on account of the negligence or tortious act of another has a right of action against the latter for indemnity, provided plaintiff and defendant are not joint tort-feasors in such sense as to prevent plaintiff from recovering. Thus it is well settled that a municipal corporation which has been compelled to pay a judgment recovered against it for damages sustained by an individual by an obstruction, defect, or excavation in the sidewalk or street of such corporation has an action over against the person who negligently or unlawfully created the defect that caused the injury." 22 Cyc. pp. 95, 96.

*Coventry* v. *Barton*, 17 Johns. (N. Y.) 142 (8 Am. Dec. 376, and note), resembles the present case. There one at work on the highway was directed by the overseer to remove a turnpike gate, promising that he "would bear him out in it." This was held a possibly valid contract of indemnity and a directed nonsuit was reversed. *Allaire* v. *Ouland*, 2 Johns. Cas. (N. Y.) 54. This exception to the rule is well supported by authorities:

"Contribution and Indemnity as Between Wrongdoers.—As under the rules already laid down the party wronged may, at his election, compel any one of the parties chargeable with the act, or any number less than the whole, to compensate him for the injury, it becomes a consideration of the highest importance to the person or persons thus singled out and compelled to bear the loss, whether the others who were equally liable may be compelled to contribute for his relief. On this subject there is a general rule, and there are also some very important exceptions. The general rule may be found expressed in the maxim that no man can make his own misconduct the ground for an action in his own favor. If he suffers because of his own wrongdoing, the law will not relieve him.

The law cannot recognize equities as springing from a wrong in favor of one concerned in committing it. But there are some exceptions to the general rule which rest upon reasons at least as forcible as those which support the rule itself. They are of cases where, although the law holds all the parties liable as wrongdoers to the injured party, yet as between themselves some of them may not be wrongdoers at all, and their equity to require the others to respond for all the damages may be complete. There are many such cases where the wrongs are unintentional, or where the party by reason of some relation is made chargeable with the conduct of others." 1 Cooley on Torts (3d Ed.), pp. 254, 255.

And see *Kenyon* v. *Woodruff*, 33 Mich. 310.

We are of the opinion that the testimony stated made a question for the jury on the subject of Molyneaux's contract of indemnity, and unless there is some other reason for taking the case from the jury the judgment cannot be sustained.

It follows that the verdict and judgment must be affirmed with costs, as to the township, and it only remains to inquire whether plaintiff is entitled to a reversal as to Molyneaux.

3. **Misjoinder.** The misjoinder of the defendant township is not necessarily a fatal point. See Cir. Ct. Rule No. 27, subds. "*b*," "*c*;" *Durgin* v. *Smith*, 115 Mich. 239 (73 N. W. 361); *Wright* v. *Reinelt*, 118 Mich. 638 (77 N. W. 246); *McPherson* v. *Pinch*, 119 Mich. 38 (77 N. W. 321); *Wilson* v. *Medler*, 140 Mich. 209 (103 N. W. 548); *Hillman* v. *Hulett*, 149 Mich. 289 (112 N. W. 918); Act No. 137, Pub. Acts 1903.

4. **Should Case Have Gone to the Jury?** If we can say that the case should have been submitted to the jury, as against Molyneaux, the judgment as to him should be reversed.

There was testimony in the case tending to show that the plaintiff was put to expense and trouble in defending a suit, growing out of a trespass for which Molyneaux was responsible and against the consequences of which he

promised to indemnify plaintiff. We do not say that either the trespass, the judgment, or the promise was conclusively proved, and we do not say that plaintiff's good faith is not open to question. We merely say that these questions were, under the proof, open, and should have gone to the jury. Counsel for the defendant urge that the testimony relating to the alleged judgment came in under objection, referring us to the following objection made before any testimony was received:

" *Mr. Farr:* Now, I would like to make an objection here, and I think we might facilitate matters if this testimony could all be taken under my general objection. My objection is that the testimony is immaterial and incompetent; that under the pleadings and under the statement of counsel there is no cause of action here under the law, and my objection may stand in that way."

It is evident from what has been said that this objection was properly overruled, and that it was competent to prove the judgment. Had the objection that parol testimony was not admissible to prove a judgment been made at the time such proof was offered, an exception to its reception might have been well taken, but it was not, and the testimony came in practically without objection. Even if we concede that all testimony was taken subject to the objection made, the court had a right to suppose that the ground was the inadequacy of the statement of plaintiff's case, by counsel.

We are of the opinion that the judgment should be reversed as to Molyneaux, and affirmed as to the township, and it is so ordered.

OSTRANDER, MOORE, MCALVAY, and BROOKE, JJ., concurred.