TAKACS *v.* DETROIT UNITED RAILWAY.

1. CARRIERS—STREET RAILWAYS—LIABILITY OF CARRIER FOR UN-
FORESEEN TORT OF FELLOW PASSENGER.

While a street railway company is not an insurer of its
passengers, yet, under the general rule as to the duty
of common carriers, it is required to exercise the highest
degree of care for their personal safety consistent with
the nature of its contract of carriage in relation to its
or its servants' acts or omissions towards them, but its
liability is not necessarily to be gauged by that standard
when intervening torts of strangers or fellow passengers
cause the injury complained of while the relation of
passenger and carrier exists; in the latter case it being
a qualified liability contingent upon whether the carrier
or its agents could, in the exercise of due diligence, have
foreseen and prevented the injury, but neglected to do so.[1]

2. SAME—NEGLIGENCE IN FAILING TO STOP.

Although a street railway company may have been liable
for the neglect of its servants operating the car in running
past a passenger's destination after he had signaled for
a stop, it is not liable for an injury thereafter sustained
by him by reason of the tort of a fellow passenger, in
the absence of any evidence that the conductor had any
knowledge, notice, or reason to anticipate that said tort
would be committed.[2]

3. SAME—UNFORESEEN ASSAULT BY FELLOW PASSENGER NOT PROXI-
MATE CONSEQUENCE OF CARRIER'S NEGLIGENCE IN FAILING TO
STOP WHEN SIGNALED.

An assault upon a passenger by a fellow passenger, in a
street car, and the consequent injuries, were not the prox-
imate or natural consequences of the negligence of the
conductor in running by the passenger's destination after
he had signaled for a stop, to be foreseen or anticipated
by the conductor.[3]

Error to Wayne; Hunt (Ormond F.), J. Submitted

[1]Carriers, 10 C. J. §§ 1324, 1332; [2]Id., 10 C. J. § 1332; [3]Id., 10
C. J. § 1392.

Carrier's liability for assault by fellow passenger, see notes
in 16 L. R. A. 627; 2 L. R. A. (N. S.) 105; 32 L. R. A. (N. S.)
1206; L. R. A. 1918F, 555.

June 17, 1925.    (Docket No. 107.)    Decided March 20, 1926.

Case by Kalmar Takacs against the Detroit United Railway for personal injuries.    Judgment for defendant on a directed verdict.    Plaintiff brings error.    Affirmed.

*Joseph S. McDowell* (*Joseph Fabian,* of counsel), for appellant.

*William G. Fitzpatrick* and, *John G. Cross,* for appellee.

STEERE, J.    On March 25, 1915, while a passenger on a west-bound interurban car on defendant's so-called "Fort line" by west Jefferson avenue to the west city limits of Detroit, plaintiff's wrist was severely cut on broken glass in a door between the smoker and main body of the car as he was attempting to reach the rear door to alight at his destination near the city limits.    Imputing the accident to negligence of defendant's agents, he brought this action in tort to recover damages for the injury so sustained.    The case came to trial in the circuit court of Wayne county on November 9, 1923, resulting in a directed verdict for defendant followed by judgment thereon.    Defendant introduced no testimony upon the trial, but when plaintiff rested moved for a directed verdict on the ground that plaintiff had failed to make out a *prima facie* case, had shown his own negligence caused his injury, and defendant's claimed negligence, if any, was not the proximate cause of the injury, and the trial court so held.    Plaintiff produced two witnesses besides himself—his cousin Alex. Takacs and a fellow-passenger named Tony Pianto.    The three resided near each other in the western portion of Detroit near the intersection of Jefferson and West End avenues, were all three employed at the Dodge automobile

factory in Hamtramck and were returning from their work together by the familiar route they were traveling that evening.

Defendant operated over its west Jefferson avenue line in connection with its local city cars a system of interurban cars known as the "Wyandotte-Trenton line," using larger and differently constructed cars for that purpose, which also were available to local passengers. These cars had an entrance at the front leading into the motorman's vestibule, from there through a door in a partition to a smoking room and from the smoker through a door in a partition into the main body of the car. Along the right side of the car facing the front was an aisle with all the seats at its left. This aisle ended at a doorway in the rear partition of the car leading out to a rear platform. The partition doors were opened and closed by sliding into and out of the partitions. Plaintiff testified that in his journeys back and forth he had never ridden in that car before.

On the evening in question the three fellow-workmen came down from their place of employment at the Dodge Brothers' plant on a Baker street car, and transferred at Griswold and Fort street to a westbound Jefferson avenue car. In so doing that evening they boarded one of the Wyandotte-Trenton interurban cars at the rear and took seats forward in the smoking room where they remained until they arose to leave the car at their destination. When they took the car it had few passengers but as it proceeded westward on its run picking them up at different points the seats became filled and the car crowded with the aisles full of standing passengers. Forward in the smoker where plaintiff was he estimated 10 or 15 could stand and said there were "as many as can stand up in there." He and his two companions sat in the back seat of the smoker next to its rear partition.

The glass in the door of the partition between the smoker and main body of the car was broken and plaintiff's wrist cut by it when he was trying to open the door to get to the rear platform to alight at his destination. Defendant's duty and negligence charged in his declaration are:

"that as a passenger on said car he was entitled to be allowed to alight safely therefrom at his destination and was entitled to be accorded reasonable free and safe egress and that the passage ways should not have been blocked by the acts of said defendant, its servants, agents and employees, or if such doors became blocked, plaintiff was entitled to have such obstruction removed and such doors opened for him by the servants, agents and employees of said defendant and that plaintiff was entitled to have said car stopped to permit him to alight upon his giving proper signal, all of which rights defendant refused to grant to plaintiff."

Plaintiff's assignments of error are against the court's direction of a verdict for defendant, errors in charging the jury, and refusal of plaintiff's requests. If the court was right in directing the verdict, plaintiff's requests and what the court said to the jury call for no consideration. The court's reasons for taking the case from the jury were, in substance, that, accepting plaintiff's testimony as true, it showed no proximate, causal connection between the conduct of defendant's agents who were in charge of the car and plaintiff's cutting his wrist on glass broken in the partition door while he was trying to open it before the car stopped. Plaintiff's testimony is somewhat at random and self-contradictory as to where he wanted to leave the car that evening. He said he was accustomed to take and get off the street cars at West End avenue, "which is the nearest point to my home, * * * I was pushing the button to get off first on the corner of Crossley. * * * I lived on Crossley— I wanted to get off at Crossley avenue;" but his story as finally told was that he did not want to get off at

either Crossley or West End avenues, but at the Solvay railroad which crosses the street car line between Crossley and West End crossings, and is a forced stop.    Leading up to his accident, he said in part:

"The car was very crowded and I thought I would get off before I got to West End avenue anyway. * * * The place I wanted to get off was Solvay crossing first. * * * I rang the bell after I got to Crossley for the purpose of stopping at the railroad track. * * * I myself rang the bell the first time; * * * I had to stand up to ring that bell.    My other two friends were sitting with me.    They were right beside me.    We all got up together in order to get off.    I started first for the front door.    I was the first one that went towards the motorman's door."

He and his cousin Alex. then worked their way through the crowd to the forward door of the smoker in the partition back of the motorman's vestibule and tried to open it, but were unable to do so.    They rapped on the glass in the door and asked the motorman through the closed door to open it.    He looked around and laughed at them, as they stated, then turned back and "kept on going."    The car started up at the Solvay railroad crossing stop while they were trying to get that door open and plaintiff rang the bell for the West End avenue crossing.    They then turned back through the crowded aisle to go to the rear of the car.    When they reached the partition door between the smoker and body of the car plaintiff first tried unsuccessfully to open it, and then Tony took hold.    Up to that time there is no evidence of any unusual disturbance or demonstration of hostility by the standing crowd in the smoker through which they had worked their way forward and back, beyond their statement that the people laughed at them. Tony's effort resulted in his falling against the side window of the car and breaking it.    His account of that accident is in part as follows:

"When I tried to open the door and I got the door open about a foot and the door was slid right back and I fell against the window—side window, Mr. Takacs was right alongside of me, and somehow the crowd was pushing, I don't know how.   *   *   * Anyway, when I pushed this door open about a foot, it slammed right back shut again.    It threw me over that time and I broke the side window.    When the crowd jumped on us, because the car was loaded; that is the time it pushed Mr. Takacs against that partition door window—that glass when he cut his hand."

Plaintiff's account of the accident is, in brief:

"Somebody else pushed it (the door) back.    Somebody pushed it back with his foot, or something.    The door-glass was broke and knocked me in the door-glass. It came shut again by somebody's foot.    It stayed shut.    Somebody pushed me against the glass, that is, knocked me in the head and I fell into it.    I don't know who pushed me.    It was just like brothers over there—   *   *   *   I didn't fall down because so many people were there I couldn't fall down."

They testified that the car did not stop at West End avenue crossing, but in the street beyond.    Tony said that at the time his elbow broke the side window "the bell was ringing again and the car was keeping on going.    When he heard it break then the motorman stopped the car."    After the car stopped the doors were opened by some one and the three men got off, plaintiff and Tony by the rear door.    Alex. said:

"You know West End, the next block is Çary.    The car stopped in the middle of the street.    I don't know what happened over there; the car stopped over there. I saw people walk out the door—what could happen. I didn't see what my cousin had—just saw that when I got off the car.    I didn't see it on the car.    I got off the front door.    As soon as the people walk—I don't know what happen—I see both doors open—both doors—front door, both doors open.    I didn't go to the partition door at all.    I was right on the front door."

If his statement is correct there was not sufficient disturbance at the middle door for him to notice it, although he was right there in the smoker, and he did not know his cousin had been hurt until after he got off the car. Plaintiff's counsel base his right to recover on the claimed negligent omission of defendant's conductor and motorman to prevent the commission of a tort upon him by an unidentified fellow passenger, under the general proposition that as a passenger on defendant's car he "was not only entitled to be carried safely but was entitled to be protected during the trip and allowed to alight safely at any intersection designated by him and which was a regular stopping place for such street car." The question of safely alighting is not involved. Plaintiff was not injured while alighting but while in the car trying to open a door in a partition between the compartments. The Solvay crossing was a forced stop between streets at a railroad crossing, not necessarily a regularly designated stopping place for convenient receipt and discharge of passengers. The motorman's paramount duty was to properly and safely operate the car, not to look after the passengers nor supervise their entering and leaving it. He was in his closed vestibule alone in performance of his duties at or near a railroad crossing, which required special care and vigilance in operation of the car, when plaintiff or his cousin rapped on the door, and through the closed door asked him to open it. He turned around on hearing them rap, and, as they state, laughed and turned back again. Alex. said he saw his lips moving, but both said they did not hear him say anything. If he spoke and they did not hear him, it is a fair inference he could not hear what they said. They made no appeal to the conductor who apparently was not in the car at that time. Plaintiff said of his then whereabouts, "the conductor got out

on the back end to see whether the crossing was clear. I didn't see him do it but he always does." We fail to discover any causal connection between a neglect of duty by the motorman and plaintiff's injury in another part of the car caused by the tort of a fellow passenger.

Plaintiff and Tony testified that when the accident happened at the rear door of the smoker the conductor was in the main body of the car near the partition door which they were on the other side of and trying to open, and did nothing to help them open it. Tony said he could not say how near, stating as his reason, "I don't know how many men were between him and the door.  *  *  *

"*Q.* Couldn't you see him from where you were?

"*A.* No, because—I can't say that." Their testimony shows that the first demonstration against them followed Tony breaking the side window, immediately after which he says the crowd "jumped on" them and plaintiff was thrown against the partition door window and his hand cut on the broken glass. Tony said that when the motorman heard the side window against which he fell break, he stopped the car. Up to that time they had said nothing to the conductor nor he to them. There is no proof or claim that the conductor was present or had any knowledge of what occurred when plaintiff tried to open the front vestibule door at the Solvay crossing, and in fact he received no injury at that time.

While defendant was not an insurer of its passengers, yet, under the general rule as to the duty of common carriers, it was required to exercise the highest degree of care for their personal safety consistent with the nature of its contract of carriage in relation to its, or its servants', acts or omissions towards them. But its liability is not necessarily to be gauged by that standard when intervening torts of

strangers or fellow passengers cause the injury complained of while the relation of passenger and carrier exists.    In the latter case it is a qualified liability, and contingent upon whether the carrier or its agents could in the exercise of due diligence have foreseen and prevented the injury, but neglected to do so.   That rule is clearly stated in *McWilliams* v. *Railway Co.*, 146 Mich. 216, where it was held the trial court properly submitted the case to the jury because there was testimony showing or tending to show that the passenger who injured plaintiff was known by the conductor to be intoxicated and annoying, had created a disturbance on the train by firing off a revolver and the conductor had threatened him that if he did not stop he would put him off the train, but did not do so nor take his revolver from him.   Justice OSTRANDER there plainly points out the distinction as follows:

"The negligence for which in such cases the carrier is responsible is not the tort of the fellow passenger or the stranger, but is the negligent omission of the carrier's servants to prevent the commission of the tort.    And courts have, in some cases, distinguished the liability of the carrier for torts committed  by the servants and those committed by passengers or by strangers.    *Tall* v. *Packet Co.*, 90 Md. 248 (44 Atl. 1007, 47 L. R. A. 120).    But the distinction made seems to go no further than this: that, while the liability to passengers carried for hire for tortious acts of servants is absolute, and that for the acts of strangers or fellow passengers is relative, contingent, and  qualified, if the servant of the carrier has, or from known conditions should have, knowledge that the condition or actions of one admitted as a passenger threaten the safety of other passengers, or that  mischief  is to be reasonably apprehended,  the duty to exercise the highest degree of care to insure the safety of passengers at once arises, failing in which  the  carrier will be held to answer for the damages sustained."

That rule as to qualified liability for torts inflicted by fellow passengers is supported by abundant author-

ity and well settled.   Defendant could only be charged with neglect by the conductor of some duty owed to plaintiff arising from facts known to him or which in the discharge of his duties he ought to have known. There is no evidence that the conductor had any knowledge, notice or reason to anticipate that the unidentified passenger to whose immediate tort plaintiff imputes his injury had previously been guilty of any misconduct, or might push or knock him into a pane of glass in the partition door.   The disturbance was initiated by the energetic efforts of plaintiff and Tony to open the partition door, during which the latter fell against and broke a side window of the car.   This was immediately followed by the assault and injury complained of.   Plaintiff had never ridden on this interurban car before.   By what rules, if any, that type of car was operated as to opening and closing its doors or receiving and discharging passengers, the record does not disclose.   But conceding a neglect of duty in that particular on the part of those operating the car and in running past plaintiff's destination, which might create a liability for actual inconvenience and expense resulting to plaintiff, an assault upon him by a fellow passenger and the cutting of his wrist on a broken window were not the proximate or natural consequences of such negligence, to be foreseen or anticipated by the conductor.   If under such circumstances the carrier's liability was tested by the bare fact that an injury was suffered through an unexpected intervening tort of a fellow passenger, it would make the carrier an absolute insurer of the injured passenger, a liability which the law of negligence does not impose.

The judgment is affirmed.

BIRD, C. J., and SHARPE, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.

Justice MOORE took no part in this decision.