Markman, J.
(dissenting). In MacDonald v PKT Inc, 464 Mich 322; 628 NW2d 33 (2001), this Court held that a merchant has a common-law duty under limited circumstances to “aid or protect” a patron or invitee from third-party criminal conduct. At issue in the instant case is whether this Court should now alter the common law and impose a similar legal duty on a residential landlord to “aid or protect” tenants and their social guests from third-party criminal conduct. Because longstanding common-law rules should not be altered absent compelling reasons for such alteration, and because the majority opinion has provided no such reasons in this case, I would continue to adhere to the general common-law rule in Michigan that a landlord has no legal duty to “aid or protect” tenants and their social guests from harm caused by a third-party’s criminal conduct. Rather, traditional understandings of legal responsibility within our common law have made clear that it is the criminal perpetrator himself who is exclusively accountable for his own criminal conduct, not a third party.
This Court has created exceptions to our common-law rule and thereby imposed legal accountability on someone other than the criminal perpetrator only in exceptional circumstances where there is some “special relationship” in which one person can fairly be said to have entrusted himself to the control and protection of *634 another with a consequent loss of control to protect himself. But the majority opinion has not offered any persuasive argument that either tenants or their social guests bear the same “special relationship” to a residential landlord as an invitee or a patron does to a merchant, or that there is any similar entrustment of control to the landlord and consequent loss of control by tenants or their social guests to protect themselves against third-party criminal conduct. For these reasons, I respectfully dissent.
I. COMMON LAW
A. NATURE OF COMMON LAW
The common law develops through judicial decisions. Placek v City of Sterling Hts, 405 Mich 638, 657; 275 NW2d 511 (1979). Thus, it has been described as “judge-made-law.” Id. In particular, “[t]he law of negligence was created by common-law judges and, therefore, it is unavoidably the Court’s responsibility to continue to develop or limit the development of that body of law absent legislative directive.” Moning v Alfono, 400 Mich 425, 436; 254 NW2d 759 (1977). As this Court explained in Bugbee v Fowle, the common law “ ‘is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes.’ ” Bugbee v Fowle, 277 Mich 485, 492; 269 NW 570 (1936), quoting Kansas v Colorado, 206 US 46, 97; 27 S Ct 655; 51 L Ed 956 (1907).
By its nature, the common law is not static; it adapts to changing circumstances. Price v High Pointe Oil Co, Inc, 493 Mich 238, 242; 828 NW2d 660 (2013). “The common law is always a work in progress and typically develops incrementally, i.e., gradually evolving as indi *635 vidual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of changing times and circumstances.” Id. at 243. As this Court stated in Beech Grove Investment Co v Civil Rights Comm:
It is generally agreed that two of the most significant features of the common law are: (1) its capacity for growth and (2) its capacity to reflect the public policy of a given era....
“The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law, but it is a flexible body of principles which are designed to meet, and are susceptible of adaption to, among other things, new institutions, public policies, conditions, usages and practices, and changes in mores, trade, commerce, inventions, and increasing knowledge, as the progress of society may require. So, changing conditions may give rise to new rights under the law ... .” [Beech Grove Investment Co v Civil Rights Comm, 380 Mich 405, 429-430; 157 NW2d 213 (1968), quoting 15 A CJS, Common Law, § 2, pp 43-44.]
B. ALTERING COMMON LAW
Nevertheless, although the common law evolves, “alteration of the common law should be approached cautiously with the fullest consideration of public policy and should not occur through sudden departure from longstanding legal rules.” Price, 493 Mich at 259. “[W]hen it comes to alteration of the common law, the traditional rule must prevail absent compelling reasons for change. This approach ensures continuity and stability in the law.” Id. at 260 (emphasis added). Thus, because it is altering the common law, the majority bears the heavy burden to provide compelling reasons for its alteration and extension of the common law. In *636 my judgment, the majority presents no compelling reasons to justify its alteration of the common law. Indeed, as set forth below, a number of persuasive reasons counsel against such a change. I would therefore continue to adhere to our present common-law rule, one that has endured from the outset of Michigan’s statehood and that faithfully reflects what has always previously been recognized as the “ ‘accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes[.]’ ” Bugbee, 277 Mich at 492, quoting Kansas, 206 US at 97.
II. COMMON LAW NEGLIGENCE
To state a cause of action for recovery under a negligence theory, certain elements must be present. These elements are: (1) that defendant owed the plaintiff a legal duty; (2) the defendant breached that legal duty; (3) that plaintiff suffered damages; and (4) that defendant’s breach constituted a proximate cause of the plaintiffs damages. Hill v Sears, Roebuck & Co, 492 Mich 651, 660; 822 NW2d 190 (2012). If any element is absent, a defendant is entitled to summary disposition.
The specific issue in this case concerns duty. In the absence of any relevant statute, the question of whether a legal duty exists in a given type of relationship is a question answered by the common law.[1] That is, this Court must determine whether under our common law defendant, a residential landlord who does not hold his *637 land open to the public, owed plaintiff, a social guest of a tenant, a legal duty to aid or protect him from third-party criminal conduct and, if not, whether we should now alter that common law and impose such a duty.
A. COMMON-LAW DUTY TO AID OR PROTECT ANOTHER
The general common-law rule is that a person has no legal duty to aid or protect another from harm, especially where, as here, such harm is caused by third-party criminal conduct. Williams v Cunningham Drug Stores, Inc, 429 Mich 495, 498-499; 418 NW2d 381 (1988). Rather, the criminal perpetrator himself is exclusively responsible for such conduct and for the harm caused.[2] MacDonald, 464 Mich at 335 (“[I]t is unjustifiable to make merchants . .. effectively vicariously liable for the criminal acts of third parties.”); Williams, 429 Mich at 503 (“The inability of government and law enforcement officials to prevent criminal attacks does not justify transferring the responsibility to a business owner.”); Scott v Harper Recreation, Inc, 444 Mich 441, 452; 506 NW2d 857 (1993) (“[M]erchants are ordinarily not responsible for the criminal acts of third persons.”). There are a small number of exceptions to this rule, however, and such a legal duty may arise “by operation of the common law.” Hill, 492 Mich at 661. As the “principal steward of Michigan’s common law,” Price, 493 Mich at 258 (quotation marks and citation omit *638 ted), this Court has been highly reluctant to modify the general common-law rule and impose a legal duty on persons to affirmatively aid or protect another from harm:
In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff. Thus, as a general rule, there is no duty that obligates one person to aid or protect another. [Williams, 429 Mich at 498-499.]
Nonetheless, we have imposed a legal duty to affirmatively aid or protect another from harm in exceptional situations in which there is some special relationship. The justification for these exceptions is that in such a special relationship, one person has entrusted himself to the control and protection of another person, with a consequent loss of control to protect himself:
Social policy, however, has led the courts to recognize an exception to this general rule where a special relationship exists between a plaintiff and a defendant. Thus, a common carrier may be obligated to protect its passengers, an innkeeper his guests, and an employer his employees. The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety. [Id. at 499.][3]
*639 As the majority and concurring opinions recognize, Williams sets forth what has always comprised our common-law general rule concerning the duty to aid or protect another, Williams, 429 Mich at 498-499, as well as the standard for identifying the limited range of exceptions to such general rule. Id. at 501. See ante at 604 (“[O]ur common law imposes a duty of care when a special relationship exists. These special relationships are predicated on an imbalance of control, where ‘one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself.’ ”).
B. COMMON-LAW PREMISES LIABILITY
As the majority and concurring opinions also recognize, our common law has long recognized that a special relationship exists between “[o]wners and occupiers of land,” Williams, 429 Mich at 499, and those who come onto the land. Accordingly, our common law imposes particular duties on the landowner that reflect the precise nature, and are a function, of this special relationship. That is, the duty imposed is tailored to the specific manner in which the person coming onto the land has entrusted himself to the control and protection of the landowner, and has consequently lost some aspect of his ability to protect himself.[4] In Hoffner v Lanctoe, 492 Mich 450, 459-460; *640 821 NW2d 88 (2012), this Court explained the precepts of this “well-recognized” common-law duty:
The law of premises liability in Michigan has its foundation in two general precepts. First, landowners must act in a reasonable manner to guard against harms that threaten the safety and security of those who enter their land. Second, and as a corollary, landowners are not insurers; that is, they are not charged with guaranteeing the safety of every person who comes onto their land. These principles have been used to establish well-recognized rules governing the rights and responsibilities of both landowners and those who enter their land. Underlying all these principles and rules is the requirement that both the possessors of land and those who come onto it exercise common sense and prudent judgment when confronting hazards on the land. These rules balance a possessor’s ability to exercise control over the premises with the invitees’ obligation to assume personal responsibility to protect themselves from apparent dangers.
The precise duty the landowner owes depends on the exact status of the other person on the land. Hoffner, 492 Mich at 460 n 8. There are “three common-law categories for persons who enter upon the land or premises of another: (1) trespasser, (2) licensee, or (3) invitee.” Stitt v Holland Abundant Life Fellowship, 462 Mich 591, 596; 614 NW2d 88 (2000).[5] The landowner owes the following duty to invitees:
*641 With regard to invitees, a landowner owes a duty to use reasonable care to protect invitees from unreasonable risks of harm posed by dangerous conditions on the owner’s land. Michigan law provides liability for a breach of this duty of ordinary care when the premises possessor knows or should know of a dangerous condition on the premises of which the invitee is unaware and fails to fix the defect, guard against the defect, or warn the invitee of the defect. [Hoffner, 492 Mich at 460.]
The landowner owes the following duty to licensees:
A landowner owes a licensee a duty only to warn the licensee of any hidden dangers the owner knows or has reason to know of, if the licensee does not know or have reason to know of the dangers involved. The landowner owes no duty of inspection or affirmative care to make the premises safe for the licensee’s visit. [Stitt, 462 Mich at 596.]
And finally, “[t]he landowner owes no duty to the trespasser except to refrain from injuring him by ‘wilful and wanton’ misconduct.” Id.
I agree with the majority that “the law of torts has treated landlords and merchants the same in the context of their [legal] duties to maintain the physical premises over which they exercise control.” Ante at 604. It is correct that neither the “landlord” nor the “merchant” has ever been excepted from these duties. The legal duties to protect visitors from physical defects that apply generally to property-owners apply notwithstanding whether the person who owns the property happens to be a “merchant” or a “landlord.” Indeed, I am unaware of any class of persons excepted by our common law from these legal duties in connection with their properties.
*642 Drawn solely from this fact, i.e., that a merchant and landlord share a common legal duty to remedy physical defects, the majority undertakes the leap in logic that the particular duty this Court has imposed on a merchant concerning third-party criminal conduct should identically be imposed on a landlord. Ante at 618 (“In line with our consistent historical treatment of merchants and landlords in the context of their duty with regard to hazards in areas under their control, we apply the MacDonald framework to [landlords] ....”). I respectfully disagree with such analysis because I do not see how this unremarkable and irrelevant historical “consistency” can have any logical bearing on the instant case. This “duty with regard to hazards in areas under their control” is universally applied to landowners, with all landowners being treated “consistently” in this regard. However, the fact that our common law has imposed this general and well-established duty regarding physical defects in property on both merchants and landlords tells us nothing about whether merchants and landlords should be treated equivalently when it comes to third-party criminal conduct. The absence of even a perfunctory analysis in this regard overlooks that the body of law that has developed concerning physical defects in property, which of course encompasses equally the property of a merchant-landowner and a landlord-landowner, has no obvious relevance in a case that concerns liability for third-party criminal conduct.[6]
*643 Again, the majority provides little analysis regarding the current state of our common law as it relates to a landlord’s distinctive liability for third-party criminal conduct. The majority does not compare the development of the common law as to a merchant’s liability for third-party criminal conduct with that of the landlord. It does not attempt to compare or contrast the distinct circumstances of the merchant and the landlord in terms either of their control over their property or the resultant loss of control on the part of others to protect themselves from third-party criminals. And the majority does not take into consideration why a landlord should be treated like a merchant where, as here, the landlord, unlike the merchant, has never held his land open to the public. As discussed below, the body of common law that has developed as to a merchant’s liability for third-party criminal conduct — a liability which is premised on the merchant holding his land open to the public — is irrelevant to the circumstances of a residential landlord, who has not held his land open to the public.
C. THIRD-PARTY CRIMINAL CONDUCT
Again, the general common-law rule is that a person has no legal duty to aid or protect another from third-party criminal conduct and cannot be held liable for *644 failing to render aid or protection. Rather, the criminal perpetrator himself is exclusively responsible for such conduct and for the harm caused.
1. MERCHANT LIABILITY FOR THIRD-PARTY CRIMINAL CONDUCT
Traditionally, courts have held that a merchant has no duty to aid or protect invitees from criminal conduct. The merchant simply had the common-law duties related to physical defects on the merchant’s premises. Rather, the criminal perpetrator himself was exclusively responsible for his criminal conduct and for the harm caused.
However, as the majority correctly notes, in a line of cases beginning with Manuel v Weitzman, 386 Mich 157; 191 NW2d 474 (1971), overruled in part on other grounds Brewer v Payless Stations, Inc, 412 Mich 673; 316 NW2d 702 (1982), this Court began to gradually erode the general common-law rule by imposing new duties to aid or protect upon “merchants” and by holding such merchants liable for an increasing array of harms caused by third-party criminal conduct. Manuel was a common-law negligence case in which a patron sued a “tavern keeper” for the injuries sustained when assaulted by another patron. This Court proceeded for the first time to expand the traditional scope of common law premises liability for tavern-keeper merchants from a “duty to repair physical defects” to a “duty to protect patrons from third-party criminal conduct.” Id. at 164. From this beginning, the ‘tavern keepers’ common-law duty to aid or protect invitees from third-party criminal conduct was extended on a case-by-case basis to other types of merchants. See Mason v Royal Dequindre, Inc, 455 Mich 391, 399-403; 566 NW2d 199 (1997) (discussing such cases). Eventually, this Court clarified the scope of the now-generally-applicable merchant’s duty *645 in a line of cases that included Williams, Scott, Mason, and MacDonald. In MacDonald, 464 Mich at 325-326, this Court provided the following summary regarding the development that had occurred in this line of cases and articulated the scope of the merchant’s legal duties:
Under [Mason], merchants have a duty to respond reasonably to situations occurring on the premises that pose a risk of imminent and foreseeable harm to identifiable invitees. We hold today that the duty to respond is limited to reasonably expediting the involvement of the police and that there is no duty to otherwise anticipate and prevent the criminal acts of third parties. Finally, consistent with [Williams], and [Scott], we reaffirm that merchants are not required to provide security personnel or otherwise resort to self-help in order to deter or quell such occurrences.
This duty to aid or protect applies to merchants: “A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose . 2 Restatement Torts, 2d, § 344, pp 223-224 (emphasis added).[7]
As discussed below, the body of common law that developed for a possessor of land who holds it open to the public for entry is inapplicable to a possessor of land who does not open his land to the public for similar entry. Indeed, in Scott and Williams this Court expressly stated that its decision did not apply with regard *646 to “the application, in the area of landlord-tenant law, of the principles discussed.” Scott, 444 Mich at 452 n 15; see Williams, 429 Mich at 502 n 17. The majority opinion provides no convincing explanation as to why a common area that is not open to the public should be treated in the identical fashion as a merchant’s property that is open to the public.
2. LANDLORD LIABILITY FOR THIRD-PARTY CRIMINAL CONDUCT
Similarly, and in accordance with the general common-law rule, courts have historically held that a landlord has no duty to aid or protect tenants or their social guests from criminal conduct. In its analysis, the majority relies on Samson v Saginaw Prof Bldg, Inc, 393 Mich 393; 224 NW2d 843 (1975) as the (sole) basis of support for its conclusion that this Court has “expanded” our traditional common-law rule regarding the duty imposed on a landlord such that a landlord can be held hable for the third-party criminal conduct that occurred in this case. Ante at 609 (“[T]his Court expanded the duty of both landlords and merchants to protect their tenants and invitees from those criminal acts.”). Although Samson is indispensable to the overall majority argument because it provides the legal basis for its conclusion that landlords are under a general duty to aid or protect tenants and their social guests from third-party criminal conduct under existing Michigan common law, it is easy to overlook this fact because the majority opinion devotes only a single sentence to Samson, despite discussing general common-law premises liability for nearly six full pages, and a merchant’s liability for the criminal conduct of a third party for nearly five full pages. This point cannot be overstated: Samson is the one and only case on which the majority opinion relies for its assertion that the landlord has a common-law duty to aid or protect tenants and their *647 social guest from third-party criminal conduct under our common law. That is, according to the majority, Samson recognized that a landlord and tenant have a special relationship of entrustment and control, and that the duty the landlord owes on account of this special relationship also extends to a tenant’s social guests. Thus, says the majority, defendant-(landlord) owed a duty to aid or protect plaintiff (tenant’s social guest) under existing Michigan common law and can be held liable for failing to render aid or protection.[8] The majority offers the following one sentence “analysis” of Samson:
Similarly, in [Samson], this Court applied the same theory of liability [that it applied in Manuel] to a commercial landlord that leased office space to an outpatient mental health clinic but that had failed “to provide some security measures or warnings for the safety of its tenants and visitors ....” [Ante at 610 (citation omitted).]
Because the majority never explains what it believes to be the theory of liability in Manuel, it is unclear what exactly it believes to be the “theory of liability” this *648 Court applied in Samson.[9] In any event, this Court made abundantly clear in Samson that it was imposing a duty on the defendant only because he had held his land open to the public.[10] Consequently, Samson’s “theory of liability” is utterly inapplicable here because defendant did not do the same.
In Samson, a clinic that treated mental-health patients, including those from the Ionia State Prison, leased space on the fourth floor of a commercial office building from the defendant, the owner of the building. Tenants in the building told the defendant’s representatives that they were afraid of the clinic’s patients, who had to use the stairs and elevators to reach the clinic, but the defendant took no action. The plaintiff, a secretary employed by a lawyer who leased an office on *649 the fifth floor, was attacked by one of the clinic’s patients in an elevator while on her way to a coffee shop located on the first floor. The plaintiff claimed that the defendant was negligent by failing to take appropriate actions to ensure that the common area of the building were reasonably safe, and the jury awarded damages. The Court of Appeals affirmed. On appeal, this Court held that it was the responsibility of the defendant to ensure that the common areas of the building were reasonably safe, and that a jury question had been presented as to whether the defendant’s failure to undertake precautionary security measures in relation to the clinic constituted a breach of its legal duty to aid or protect the plaintiff.
Begarding the special relationship that provided the source of the defendant’s duty, this Court explained:
Defendant leased its premises to the Mental Health Clinic. For this act, by itself, our law imposes no liability and indeed should impose none. Whether or not the landlord retains any responsibility for actions which occur within the confines of the now leased premises is not now before this Court and need not be answered. It would appear, however, that he would not retain any responsibility for such actions except in the most unusual circumstances. However, the landlord has retained his responsibility for the common areas of the building which are not leased to his tenants. The common areas such as the halls, lobby, stairs, elevators, etc., are leased to no individual tenant and remain the responsibility of the landlord. It is his responsibility to insure that these areas are kept in good repair and reasonably safe for the use of his tenants and invitees.
The existence of this relationship between the defendant and its tenants and invitees placed a duty upon the landlord to protect them from unreasonable risk of physical harm. 2 Restatement Torts, 2d, § 314A(3). [Samson, 393 Mich at 407.]
*650 As can be seen from the above quotation, this Court made it clear that its decision was based on 2 Restatement Torts, 2d, § 314A(3), p 118, which provides:
A possessor of land who holds it open to the public is under a similar duty to [aid or protect] members of the public who enter in response to his invitation. [Emphasis added.][11]
As subsection (3) makes clear, the duty imposed on the owner of the commercial office building to aid or protect the attorney’s secretary was not based on the owner being a “landlord” and leasing office space to commercial tenants, one of whom employed the plaintiff. Indeed, a “landlord-tenant” relationship could not have been the source of the defendant’s legal duty to aid or protect the plaintiff because the plaintiff and the defendant did not even have a “landlord-tenant” relationship.[12] That is, the defendant was not the plaintiffs landlord and the plaintiff was not the defendant’s tenant. Rather, the only relationship the plaintiff had *651 with the defendant was that the plaintiff was employed as a secretary by one of the defendant’s tenants.
However, what is most obvious and pertinent about the Samson analysis is that the special relationship, and attendant legal duty to aid or protect, was a function of the defendant holding his land open to the public.[13] Thus, in the same way that the owner of a mall leases individual storefronts to commercial tenants and invites the public into the common area over which the owner retains control (e.g., walkways, restrooms, escalators), the defendant in Samson leased the individual offices to commercial tenants and invited the public into the common area over which it retained control. According to 2 Restatement Torts, 2d, § 314A(3), which, again, constituted the only stated legal basis for our decision in Samson, the owner has a legal duty to aid or protect invitees because it has held these areas open to *652 the public, not because the owner happened also to be a “landlord” who leased property to commercial “tenants” in the building.
In contrast, and particularly relevant to this case, the common area of a residential apartment building is not open to the public, nor is the general public invited to gather there. Whether a residential common area lies within an expansive apartment complex or within a large house converted into apartments, the world is not invited into these areas. Rather, the common area of an apartment building is simply not a place of public use or gathering from which a landlord, in the same manner as a merchant or mall owner, profits from the presence of the very public that has been invited onto his property, and therefore must in fairness share in the legal risks to which public invitation may give rise. The common area of a residential apartment is by its nature private and open only to those persons invited onto the property. It is to all significant purposes the equivalent of a home, in which residents are generally responsible for their own protection from third-party criminal conduct. Absent some compelling explanation as to how the differences between a home and an apartment impose on residents of the latter some real diminution in the ability to protect oneself from such conduct, the legal duty to aid or protect that this Court recognized in very different circumstances in Samson on the basis of Restatement, § 314A(3) is inapplicable to this case, and there is no other decision of this Court that stands for the same proposition that the majority opinion erroneously attributes to Samson.
The majority fails to account for this Court’s specific citation in Samson to Restatement, 2d, § 314A(3). By failing to recognize that the legal duty at issue in Samson was predicated on the special relationship set *653 forth in § 314A(3), the majority is left free to determine at its own discretion that the legal duty there was predicated on some other special relationship. In other words, by not giving consideration to the exclusive reliance in Samson placed on Restatement, § 314A(3), the majority is able to characterize the special relationship in Samson as it sees fit and to assert that the legal duty identified in that case was imposed on the basis of that special relationship, rather than on the basis of the special relationship that, in fact, was expressly at the heart of Samson and that was grounded on Restatement, § 314A(3). Although in this case, the majority deems that a “landlord-tenant” relationship constituted the source of the legal duty to aid or protect imposed in Samson, in the next case it could just as easily identify such legal duty as reposing in a “building owner-elevator rider” special relationship, or a “building owner-lawyer’s secretary” special relationship, as the source of a defendant’s legal duty to aid and protect. Whatever check or constraint can reasonably be derived from Restatement, § 314A(3) on the scope of exceptions to the general rule in Michigan that there is no legal duty to aid or protect another from the criminal conduct of third parties has been eroded by the free-form analysis of the majority opinion.
Given that Samson is inapplicable, the majority opinion lacks support for its assertion that the landlord here had a common-law duty to aid or protect a tenant’s social guest from third-party criminal conduct under the existing common law.[14] Rather, the majority is *654 altering the common law by creating a new special-relationship exception to the common-law rule that there is no legal duty to aid or protect another from third-party criminal conduct and thus imposing on “landlords” whose property is not open to the public, new legal responsibility and accountability for the criminal conduct of third parties.[15]
3. “CLARIFYING” SAMSON DUTY
After firstly concluding erroneously that defendants *655 are subject under our common law to Samson, the majority then, secondly, proceeds to transform the Samson duty as a function of “clarifying” it, and then, thirdly, it effectively overrules Samson by “limiting” it. The majority states that although Samson “implied some duty for a landlord ... to take prophylactic measures to prevent third parties’ criminal acts before they are imminent, it did not specifically articulate the measures that a landlord . . . must take to obviate the hazard of third parties’ criminal acts.” Ante at 610-611. The majority states that the “implied” duty in Samson was “amorphous,” ante at 611, and then “clarifie[s] .. . the scope of the [Samson] duty,” ante at 16, by imposing onto a landlord the entire body of common law that developed as to a merchant’s liability for third-party criminal conduct. See ante at 615 (“the duty clarified today”).
This “clarified” duty imposed from the line of common-law decisions concerning a merchant’s liability for third-party criminal conduct has no bearing on the question of what duty, if any, should be imposed on the landlord, at least absent compelling justification. Indeed, the majority adopts this merchant’s duty despite the fact that the landlord in this case bears little resemblance to a merchant, and despite the fact our common law has in no way treated a merchant and a landlord in an equivalent fashion when it comes to third-party criminal conduct. Even if one were to overlook that in this case there is no duty to be “clarified” because the Samson duty does not apply to landlords, the “clarified” duty applied in lieu of the Samson duty is in fact a new duty that this Court has never before imposed. Notably, if the majority’s “now-clarified” duty were to be applied in Samson — the very case on which the majority relies for the legal duty that it is now “clarifying” — Samson would be effectively overruled *656 because there would be no factual basis for upholding the jury verdict that imposed liability on the landlord.[16] Despite this, the majority still fails to acknowledge that it is altering the common law of this state, opining only that “[t]o the extent this holding.. . conflict^] with Samson, we limit Samson to the duty clarified today and in MacDonald.” Ante at 615.
Moreover, although the majority acknowledges that we have imposed a legal duty to affirmatively aid or protect only in exceptional circumstances in which there is some special relationship, it fails to explain how this test has been met here and how the “now-clarified” duty it imposes is designed to mitigate against the consequences of the particular entrustment and consequent loss of control that exists under these parties’ special relationship. Before legal responsibility and accountability for third-party criminal conduct is apportioned and extended beyond the actual criminal perpetrator himself, this Court is obligated under its own *657 “control and protect” standard to show clearly how: (a) a person can fairly be said to have entrusted himself to the control and protection of another; (b) such entrustment was reasonable; and (c) as a result of such entrustment, there has been a consequent loss of control by that person to protect himself. The majority opinion not only does none of these things before redefining the common-law legal duties in this case, but it also fails to answer what is invariably the ultimate and practical inquiry in a case in which the common law is to be altered — what has changed in our society, what has evolved in our customs and practices and values, what is different as to our expectations in terms of the law, that justifies imposition of a legal duty in 2013 on landlords to aid or protect tenants given that there has been no such legal duty in the past 176 years of Michigan’s common law?
I have no doubt that this Court possesses the legal authority to undertake today’s decision, and I can understand how reasonable people can differ from my own viewpoint as to the wisdom of the majority’s course of action, but this Court today undertakes something that is significant and consequential when it redefines the legal consequences of criminal conduct and establishes new legal duties in that regard within our common law. This Court, in my judgment, owes a far more thorough explanation in support of why this redefinition of our legal rights and responsibilities has now become necessary.
Although I certainly agree with the majority that a landlord has a substantially higher degree of control over the physical structures and architecture of the common area, I fail to follow how that higher degree of control, which is already accounted for by the duties imposed under traditional common-law premises liabil *658 ity principles, has any bearing on whether tenants or their social guests have entrusted themselves to the “control and protection” of the landlord and, in so doing, have diminished or compromised their own ability to protect themselves against third-party criminal conduct. According to the majority opinion, “as a matter of law, the duty to respond requires only that a landlord make reasonable efforts to expedite police involvement.” Ante at 616. Making reasonable efforts to expedite police involvement is apparently all that is required by the majority’s rule. Per the majority, the landlord is not required to modify or repair the common area in any way that makes criminal conduct less likely, he is not required to take control of these areas and actively root out criminal conduct that may be occurring or that is imminent, and he is not required to institute surveillance or any other particular security precaution. If he were required to do any of these things, I might agree with the majority opinion that the landlord would be in the better, if still not exclusive, position to undertake these measures as a function of his control over the common area. But by the majority’s holding, the landlord is not obligated to do such things, because that is not what the MacDonald legal duty requires. Indeed, the landlord is not even required to make himself available to tenants so that he may become better aware that a third party’s criminal conduct may be imminent. In light of the specific legal obligations, and nonobliga-tions, imposed on the landlord via MacDonald, how precisely does the landlord’s greater control over the common area place the landlord in a better position to “make reasonable efforts to expedite police involvement?” And how precisely does the landlord’s greater control over the common area have any bearing whatsoever as to whether the landlord or tenants and their social guests are in a better position to undertake such *659 efforts? Where a third-party criminal threat arises, and where the landlord becomes aware of that threat, what exactly is the relevance of the landlord’s control over the common area of the property? How does this control assist the landlord, or hinder the tenant, in attempting to “expedite police involvement.” The majority opinion does not say. To take into consideration only a single factor, would not the development of cellular-telephone technology over the past generation render tenants in 2013 even more capable of expediting such police involvement than tenants in 1983, 1903 or 1843?[17]
*660 Furthermore, the tenant who believes that criminal conduct is imminent is free to make reasonable efforts on his own and to expedite police involvement, and is in no way prevented from taking such an action as a result of the landlord’s higher degree of control over the common area. The tenant is in closer proximity to his home, a presumed place of safety to which he and his guests may retreat, and again is in no way prevented from undertaking such actions as a result of the landlord’s higher degree of control over the common area. Indeed, in this very case, the security guards hired by the landlord themselves had no obvious place of safety or retreat.[18] Even if the landlord happens to be actually present within the common area, the tenant does not lose any ability to protect himself as a consequence of the landlord’s higher degree of control.
4. MACDONALD DUTY AND LANDLORDS
Not only, I believe, has the majority opinion failed to present “compelling reasons” for altering the common law, but the status quo represents responsible and rational public policy, a consideration crucial to this Court’s common-law decisionmaking. Indeed, extend *661 ing the MacDonald duty advanced by the majority opinion is contrary to sound public policy, in my judgment, for several reasons.
Presence — First, to reemphasize a point made earlier, there is an important distinction between the merchant in MacDonald and the landlord in this case in that the merchant (or his employees and agents) almost always has to be physically present on the business premises to serve customers and otherwise conduct business. By contrast, the landlord (and his employees or agents) has no similar reason to be physically present. This is particularly true of landlords of more modest rental properties. Indeed, a landlord may have no reason at all to visit a common area of an apartment building for weeks or months on end, and even large rental properties may have their leasing and management offices off-site, far away from the common area of the actual apartment building. In other words, the merchant’s presence on the premises of his property is largely obligatory, whereas the landlord’s presence in the common area of his property is largely discretionary.
As a result, imposing the MacDonald duty on landlords will almost certainly encourage at least some landlords to take greater care in avoiding the common area since it is their largely discretionary presence in such area that apparently constitutes the only means by which the landlord can gain the awareness of criminal conduct in the first place that would give rise to the MacDonald duty.[19] In other words, a landlord who *662 provides security guards or video cameras or alarms in the common area will ironically be exposed to a greater risk of legal liability for the criminal conduct of third parties than will a landlord who simply fails to take take such precautions. As a consequence, imposing the MacDonald legal duty can only have the effect of disincentivizing and discouraging some landlords, especially those in the high-crime neighborhoods most in need of vigilance against third-party criminal conduct, from instituting the very security measures that will trigger this duty in the first place. Compare, MacDonald, 464 Mich at 341 (asserting that the dissent’s rule in that case, which would have allowed the character of the merchant’s business and an assessment of whether prior similar conduct had occurred on the premises to be considered, “would unfairly expose merchants in high-crime areas to excessive tort liability and increase the pressure on commercial enterprises to remove themselves from our troubled urban and high-crime communities”). Imposing this new liability on landlords will do nothing to promote safety for the low-income tenants in high-crime neighborhoods who are the most in need of protection. Instead, it is likely to harm these very individuals.
Disincentives — Second, imposing the MacDonald legal duty on landlords runs afoul of the policies underlying this Court’s decision in Scott, in which this Court explicitly declined to adopt a policy that “would penalize merchants who provide some measure of protection, as opposed to merchants who take no such measures.” Scott, 444 Mich at 452 (quotation marks and citation *663 omitted). Because only the landlords who provide security in the common area will face potential liability under MacDonald, the majority’s new legal duty will penalize precisely those landlords who “provide some measure of protection.” The landlords who do so will be held to a higher legal duty than those who do not, and those landlords who are the most compelled to undertake such protection as a result of high levels of criminal conduct within the neighborhoods in which their properties are located will be the hardest hit by potential lawsuits. Clearly in this case, the defendants’ provision of security guards is the only thing that gives rise under the majority opinion to potential legal responsibility for third-party criminal conduct.
False Alarms — Third, imposing the MacDonald duty on landlords will result in a considerable increase of “false alarm” calls to police, since a call to the police is the principal step landlords must take to avoid liability. No landlord will risk exercising any judgment if he becomes aware by any means of a problem arising on his property — an unidentified person, a broken window, an unaccounted-for piece of personal property, a nearby fracas, or anything at all that might be viewed in hindsight as having created a “specific situation occur[ring] on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee,” MacDonald, 464 Mich at 335. An “identifiable invitee” is a person who is within the “range of risk of harm created by [the criminal’s] conduct.” Ante at 618; see n 21. The mere fact that a crime later occurs will almost always allow one to draw the conclusion, after-the-fact, that there was a specific situation occurring on the premises that should have prompted a reasonable person to recognize a risk of imminent harm to an identifiable invitee. As the instant case amply demonstrates, the relative costs and benefits *664 of not promptly communicating with the police under these and other circumstances are simply not compatible with the exercise of reason and judgment in deciding when to call the police. Call the police and there may be no liability at all; fail to call the police and you too can walk in the shoes of defendants in this case. Repeated “false alarms,” and “crying wolf” will increasingly burden our state’s police emergency systems, with all the attendant decline in efficient and timely response that such unnecessary calls can be expected to produce.
Litigation — Fourth, imposing a new legal duty on landlords will give rise to more litigation. Concerning the specific legal duty to aid or protect, there will certainly be litigation concerning: (a) whether the landlord in a sufficiently timely manner recognized the arising of a “specific situation occurring on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable inviteet;] ” (b) whether the landlord’s efforts to expedite police involvement were reasonable; (c) whether the landlord informed the police of the specific situation in a sufficiently timely manner; (d) whether the landlord informed the police of the specific situation in a manner thoroughly describing its circumstances and communicating its urgency; (e) whether the landlord acted reasonably in his estimation of who constituted a potentially vulnerable “identifiable invitee;” (f) whether the landlord was sufficiently proactive in acquiring knowledge concerning the specific situation; (g) whether such security measures as were employed by the landlord, such as 24-hour surveillance videos, were thoroughly and conscientiously monitored; and (h) whether security guards employed by the landlord acted responsibly in all facets of their conduct. And, of course, inevitably over time, there will be the litigation to urge *665 expansion of the MacDonald duty to contemplate security precautions the landlord should have undertaken that might have forestalled criminal conduct from occurring in the first place, requiring some evaluation of the probability of future criminal conduct on the basis of an analysis of past occurrences of such conduct within the relevant neighborhood. See MacDonald, 464 Mich at 343-344 (discussing this “relatedness test”); id. at 351-352 (Cavanagh, J., dissenting). Indeed, whereas MacDonald was the product of an evolution of merchant-liability cases occurring over the course of three decades, the majority’s decision today, imposing for the first time the same legal duty on the landlord, may well represent merely the first stage in what will surely become a similar common-law evolution over the next three decades.
Accountability — Finally, I simply do not believe that our common law is advanced when it is slowly, and step-by-step, transformed from a legal system grounded in traditional notions of personal responsibility, in which criminal perpetrators are fully and exclusively responsible for their own behavior, into a system in which “special relationships” are increasingly employed as vehicles by which to apportion to assorted classes of non-criminal actors— in this instance, a residential landlord- financial accountability for the consequences of criminal conduct.[20]
*666 hi. CONCLUSION
The common-law analysis of the majority opinion is flawed, in my view, for the following reasons:
(1) The majority opinion grounds its analysis on a single decision of this Court, Samson, that has been transformed from a decision in which a legal duty was expressly predicated upon the fact that a commercial building owner held a property open to the public into a decision purportedly predicated on a previously nonexistent “special relationship” imposing on a landlord a legal duty to aid and protect tenants with regard to third-party criminal perpetrators;
(2) The majority opinion then takes the landlord duty it has erroneously imported from Samson and proceeds, as a function of “clarifying” Samson, to replace this nonexistent duty with the distinct and unrelated merchant duty drawn from another decision of this Court, MacDonald;
(3) The majority opinion then justifies this “clarification” on the basis of the unremarkable and irrelevant fact that neither landlord nor merchant has been excepted from the general premises-liability rules that apply to all owners of all types of real property;
*667 4) The majority opinion provides no compelling reason, as it is obligated to do before altering the common law, for imposing any new legal duty on a landlord to protect tenants against third-party criminal conduct, much less compelling reasons why a landlord whose property is closed to the public should bear legal duties identical to those of a merchant whose property is held open to the public;
(5) The majority opinion engages in no assessment of public policy considerations as a precondition to its alteration of the common law, including most significantly the merits of its further departure from the general common-law principle that it is the criminal perpetrator who is exclusively accountable for his own criminal conduct, not a third party;
(6) The majority opinion does not explain how there has been “entrustment” of control to the landlord by tenants, and/or consequent loss of control by tenants, with regard to their protection from third-party criminal conduct, or how the specific legal duties imposed on a landlord by the majority opinion effectively mitigate against the consequences of such entrustment and/or consequent loss of control; and
(7) The majority opinion also does not explain why the landlord-tenant “special relationship” extends to a tenant’s social guests.
Furthermore, the majority opinion fails to satisfy its burden of demonstrating “compelling” reasons for why the common law that has always existed in this state should now be altered by further apportioning among those who have perpetrated no criminal conduct, legal accountability and responsibility for the harms caused by third parties who have perpetrated such conduct. Indeed, there are a number of compelling reasons in support of maintaining the present rule that there is no legal duty to aid or protect another from third-party criminal conduct unless a special relationship has been established in which a person can be said to have *668 entrusted himself to the control and protection of another person with a consequent loss of control to protect himself. The majority has not offered any persuasive argument that either tenants or their social guests bear the same special relationship to a residential landlord as an invitee or a patron does to a merchant, or that there is any similar entrustment of control to the landlord, and consequent loss of control by tenants or their social guests to protect themselves against third-party criminal conduct. Accordingly, I would reverse the Court of Appeals and reinstate the trial court’s judgment dismissing plaintiffs claim.

 Although it is an ordinary responsibility of a common-law judge to decide whether there is an established legal duty in a tort case, the question before this Court is a distinct one, to wit, whether we should create a new legal duty, i.e., a new basis for a negligence action by altering the common law to impose a legal duty on a residential landlord to protect a tenant and their social guests from third-party criminal conduct.

 That one may have a moral duty or obligation to aid or protect is not the equivalent of having a legal duty to aid or protect. Thus, although a person who sees that a pedestrian is about to walk into oncoming traffic certainly possesses a moral obligation to intervene, a person has never been viewed as having a legal obligation to do so, and as a result the law will not hold him or her liable or accountable in a courtroom for the harms that occur where this moral obligation is not carried out. This is not an area of disagreement among any of the opinions in this case.

 See also Hill, 492 Mich at 666 (“The rationale behind imposing a duty to protect in these special relationships is based on control. In each *639 situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself.”) (quotation marks and citation omitted); Dawe v Dr Reuven Bar-Levav & Assoc, PC, 485 Mich 20, 26; 780 NW2d 272 (2010) (same); 2 Restatement Torts, 2d, § 314A(4), p 118 (“One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to [aid or protect] the other.”).

 When such a relationship exists, the particular duty that is imposed serves to alleviate the particular entrustment and consequent loss of control that exists as a result of the parties “relationship.” Thus, *640 different duties are imposed in different circumstances. See, e.g. Takacs v Detroit United R, 234 Mich 42, 49-51; 207 NW 907 (1926) (common carrier).

 “A ‘trespasser’ is a person who enters upon another’s land, without the landowner’s consent.” Stitt, 462 Mich at 596. “A ‘licensee’ is a person who is privileged to enter the land of another by virtue of the possessor’s consent.” Id. “Typically, social guests are licensees who assume the ordinary risks associated with their visit.” Id. “An ‘invitee’ is ‘a person who enters upon the land of another upon an invitation which carries with it an implied representation, assurance, or understanding that reasonable care has been used to prepare the premises, and make [it] safe *641 for [the invitee’s] reception.’ ” Id. at 596-597, quoting Wymer v Holmes, 429 Mich 66, 71 n 1; 412 NW2d 213 (1987).

 Indeed, there is a corollary to the landlord’s duty with regards to hazards in the common area: the tenant bears responsibility for conditions in those parts of the leasehold under the tenant’s control. See Williams, 429 Mich at 499 n 10 (“The landlord is not liable for injuries that occur within the boundaries of the leased premises.”). Why then, under the majority opinion’s analysis, would a tenant, in his area of control, not bear the same obligation as a landlord to protect others from *643 third-party criminal conduct? Why would every landowner not owe this same duty? See Miller v Whitworth, 193 W Va 262, 267-268; 455 SE2d 821 (1995) (quoting Clarke v JRD Mgt Corp, 118 Misc2d 547, 549; 461 NYS2d 168 (1983) (“The trend toward enlarging the duty of landlords and other private parties to provide security against criminal acts, even in the absence of agreements to do so, has the potential of reaching absurd proportions. One can foresee landowners, proprietors of restaurants, stores, theaters, hanks, schools and, indeed, public buildings being civilly responsible for all crimes on their premises.”). I would add to the foregoing list homeowners and farmers.

 Although MacDonald rejected the argument that Mason adopted the entire “rule” set forth in § 344 and comment f to § 344 of 2 Restatement Torts, 2d, MacDonald, 464 Mich at 341-342, there was no indication that MacDonald rejected the Restatement’s description of the class of people who owed this duty, or that the “merchant” duty in MacDonald was imposed on anyone other than those who hold property open to the public. Indeed, MacDonald clarified the common-law duty owed by this very class of people. Id. at 325-326.

 The majority opinion further makes it clear that the duty it has found under our existing Michigan common law, and then “clarified” by imposing the merchant’s duty does not come from this Court’s decision in Johnston v Harris, 387 Mich 569; 198 NW2d 409 (1972), which, according to the majority opinion, concerned “the landlord’s duty to repair physical defects in common areas.” Ante at 615 n 57 (“We do not address the status of [Johnston], because it is not implicated under the facts of this case.”). The concurring opinion likewise agrees that this case does not concern the type of physical defects that were at issue in Johnston. Ante at 625 (concurring opinion) (“[P]laintiff. .. asserts that defendant landlords owed him a duty to protect against imminent third-party criminal conduct that was not the result of or facilitated by the landlord’s failure to maintain the physical premises."). The Court of Appeals reached this same conclusion. Bailey v Schaaf, 293 Mich App 611, 640; 810 NW2d 641 (2011) (“[Tjhis case clearly does not involve a condition on the land that placed Bailey at a heightened risk of harm at the hands of third parties.”) (emphasis in original). I agree that Johnston as a genuine premises-liability case is distinguishable from the instant case.

 To the extent the majority is asserting that the “theory of liability” was a function of the duty owed by an owner or occupier of land, i.e., general premises liability, one might wonder why the majority opinion gives no consideration to the open-and-obvious-danger doctrine, a doctrine closely enmeshed with premises liability. Under this doctrine, a landlord’s (or any other landowner’s) duty to protect others from dangerous conditions “does not extend to conditions from which an unreasonable risk cannot be anticipated or to dangers so obvious and apparent that an invitee may be expected to discover them himself.” Williams, 429 Mich at 500. It appears that the third-party criminal conduct at issue here may well have been so obvious and apparent that an invitee may have been expected to discover them himself. Indeed, the tenants appear to have quickly and easily discovered the danger.

 Clearly, landlords and tenants have the special relationship of entrustment and consequent loss of control that exists between “owners and occupiers of land” and those who come onto the land, and thus a landlord owes a tenant the traditional common-law duties that pertain to address the entrustment and consequent loss of control that exist under that particular special relationship. See n 5. But this landlord and his tenant’s social guest do not have the particular special relationship of entrustment and consequent loss of control that was the source of the Samson defendant’s duty to aid or protect the plaintiff from third-party criminal conduct. Having a special relationship in one realm does not signify that parties must have a special relationship in every realm.

 Samson cited 2 Restatement Torts, 2d, § 314A(3) as the sole support for its concluding sentence in the relationship and duty section, the very same sentence in which it held that that there was a relationship and duty. Samson, 393 Mich at 407. That this Court chose to reference a single citation, and to cite a specific subsection can be nothing other than a deliberate decision. To hold then that this Court was not genuinely applying the only legal rule that it actually cited in support of its decision is, to say the least, a considerable stretch.

 Black’s Law Dictionary (9th ed), defines “landlord” as “[o]ne who leases real property to another,” and “tenant” as “[o]ne who holds or possesses lands or tenements by any kind of right or title.” Id. It defines “landlord-tenant relationship” as:
The legal relationship between the lessor and lessee of real estate. The relationship is contractual, created by a lease (or agreement for lease) for a term of years, from year to year, for life, or at will, and exists when one person occupies the premises of another with the lessor’s permission or consent, subordinated to the lessor’s title or rights. [Id.]

 The concurring opinion states:
Justice Markman argues that Samson is distinguishable because it involved a commercial landlord, not a residential landlord, and Samson cited to § 314A(3) of the Restatement, which addresses premises owners who hold their land open to the public. Also, commentators have surmised that the duty imposed in Samson may be characterized as arising out of the defendant’s act of leasing the premises to a potentially dangerous tenant. Dobbs, The Law of Torts, § 325, p 880 n 5 (citing Samson and explaining that some jurisdictions impose a duty on a landlord if the landlord helped create the danger that harmed the plaintiff). [Ante at 627 (concurring opinion).]
First, although Samson involved a commercial landlord, this Court made it clear that it was imposing a duty on the defendant not because he was a commercial landlord but because he held his land open to the public. Second, regarding the commentator’s theory of Samson, this Court went out of its way to make it clear that this was not the basis for its decision, stating:
Defendant leased its premises to the Mental Health Clinic. For this act, by itself, our law imposes no liability and indeed should impose none. [Samson, 393 Mich at 407.]

 Even if our decision in Samson had been predicated on the existence of a landlord-tenant special relationship, there is no such special relationship in the instant case because plaintiff, again, was not a tenant. The majority supplies no explanation as to why a landlord owes a tenant’s social guest the same duty it owes the tenant himself, with whom it has *654 a landlord-tenant relationship. The majority merely labels the tenant’s social guest an “invitee” without any further explanation. However, “[tlypically, social guests are licensees who assume the ordinary risks associated with their visit.” Stitt, 462 Mich at 596; see Jack v Fritts, 193 WVa 494, 499; 457 SE2d 431 (1995) (holding that a landlord owes no duty to a tenant’s social guest to protect that guest from third-party criminal conduct because such a duty is predicated on the existence of a landlord-tenant special relationship and the landlord and tenant’s social guest lack any such relationship).

 Moreover, the majority provides no definition of “landlord.” It is thus unclear exactly who is now subject to this new duty and legal liability. Is a “landlord” “[o]ne who leases real property to another?” Black’s Law Dictionary; see n 15. Or does the statutory definition of “landlord” provided in this state’s Landlord Tenant Relationship Act apply? See MCL 554.601(c) (“ ‘Landlord’ means the owner, lessor, or sublessor of the rental unit or the property of which it is a part and, in addition, means a person authorized to exercise any aspect of the management of the premises, including a person who, directly or indirectly, acts as a rental agent, receives rent, other than as a bona fide purchaser, and who has no obligation to deliver the receipts to another person.”). Or perhaps some other definition? The majority does not say. If a child moves home after college and his parents charge him $100 a month to “rent” a room, do the parents now owe this new “landlord” duty to their child and all of his or her guests? Is a person who rents out his basement apartment now subject to this new legal duty? What of the owner of a duplex who lives in one half and rents out the other? Is he subject to this new legal duty? All that is certain is that the present opinion of the Court will yield new litigation, new creative theories of legal liability, higher insurance premiums on landlords, and that some unknown number of landlords will ultimately be held legally responsible and accountable in the courtroom for the criminal conduct of third parties.

 The duty imposed in Samson required the landlord to “investigate” and take “available preventative measures” where tenants “voiced their concern and uneasiness over the [mental patients’] use of the elevators and stairwells of the building.” Samson, 393 Mich at 404, 411. In contrast, under the “clarified” Samson duty — i.e., the MacDonald duty — a landlord has no obligation to “investigate” or “take any preventative measures” with regard to third-party criminal conduct. The landlord’s only duty is to “make reasonable efforts to expedite police involvement,” ante at 616, when confronted with a “specific situation occurring] on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee,” MacDonald, 464 Mich at 335. The victim in Samson was robbed in seclusion, in an elevator. Samson, 393 Mich at 398-399. When the elevator “reached the ground floor, [the third-party criminal] ran away.” Id. at 399. The landlord in Samson thus lacked notice of third-party criminal conduct sufficient to trigger his MacDonald duty to call the police. That is, he had no notice whatsoever that a crime was occurring in the elevator. See ante at 628 n 6 (concurring opinion) (“[T]he duties at issue in Samson and MacDonald appear distinguishable.”).

 The concurring opinion contends that there is a “reasonable expectation that landlords will provide some degree of supervision and control over the activities occurring within the common areas.” Ante at 629 (concurring opinion). However, it does not say how “provid[ing] some degree of supervision and control over the activities occurring within the common areas” is any different than “expecting” the landlord to provide a safer environment than that encountered in the community-at-large, the very argument this Court soundly rejected in Williams, 429 Mich App at 502:
[Although defendant can control the condition of his premises by correcting physical defects that may result in injuries to its invitees, it cannot control the incidence of crime in the community. Today a crime may be committed anywhere and at any time. To require defendant to provide armed, visible security guards to protect invitees from criminal acts in a place of business open to the general public would require defendant to provide a safer environment on its premises than its invitees would encounter in the community at large. Defendant simply does not have that degree of control and is not an insurer of the safety of its invitees.
Even if we assume that some tenants or their social guests may “expect” the landlord to “provide some degree of supervision and control,” no explanation is provided for why such an “expectation” is reasonable or would cause responsible persons to be diminished or compromised in their own ability to protect themselves. In fact, this Court has explicitly rejected liability on the basis of a person assertedly being “induced to relax his normal vigilance,” Scott 444 Mich at 451, yet such speculation is exactly what underlies the tenant behavior that the majority presents as justification for imposing greater legal duties on the landlord. Indeed, although a property owner can always control the condition of his *660 premises by correcting physical defects that may result in injuries, he cannot always affect, much less control, the incidences of crime within his community. The inability of government and law enforcement officials to abolish all violent crime does not justify transferring liability to a landlord or to the security company that the landlord hires. See Williams, 429 Mich at 503.

 The security guards did not possess keys to the landlord’s office/private area. One guard had a personal cell phone, and the other had no phone. Thus, only one even possessed the present ability to contact the police. Moreover, both guards lacked the threshold authority the majority deems essential to its imposition of a duty on the landlord; neither had any right to alter or control any physical structure in the common area.

 The majority opinion clearly recognizes that such awareness is crucial:
Only when given notice of [a situation occurring on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable tenant or invitee] is a duty *662 imposed on a landlord. Notice is critical to the determination whether a landlord’s duty is triggered; without notice that alerts the landlord to a risk of imminent harm, it may continue to presume that individuals on the premises will not violate the criminal law. [Ante at 615.]

 Even if I were to agree that the MacDonald duty should be imposed on landlords, I would still disagree with the majority that we are positioned to conclude that plaintiff constituted an “identifiable invitee.” The provenance of the “range of risk of harm created by the criminal’s conduct” test articulated by the majority opinion is unclear. No case is cited in support of this standard. However, such a test is not set forth in MacDonald, and it seems largely tautological. That is, a victim harmed by criminal conduct would seemingly by that fact alone be “within the range of risk of harm created by” that criminal conduct or else the victim would not have become a victim in the first place. If that is the test, I hardly see *666 where reasonable minds could ever differ on this point. Compare, MacDonald, 464 Mich at 338 (“Whether an invitee is readily identifiable as being foreseeably endangered is a question for the factfinder if reasonable minds could differ on this point.”).
Under MacDonald, there is no duty “until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee.” Id. at 335. In my view, the “specific situation” here is not Schaaf brandishing a gun in the common area, but the tenant earlier informing the security guards that Schaaf was engaging in such conduct. The critical question thus is whether that “specific situation” — the tenant so-informing the security guards — would “cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee.” The majority opinion’s conclusion that plaintiff constituted an “identifiable invitee” presupposes that the security guards immediately recognized a situation occurring in the common area that posed a risk of imminent and foreseeable harm to plaintiff. However, whether this is true or not would ordinarily pose a question of fact for the jury. Id. There is more than a little benefit-of-hindsight analysis in this regard.